CARMEN RODRIGUEZ & another[1] vs. CAMBRIDGE HOUSING
AUTHORITY.

No. 01-P-888.

Middlesex. February 10, 2003. - September 3, 2003.

Present: GREENBERG, DOERFER, & KAFKER, JJ.

Further appellate review granted, 442 Mass. 1105 (2004).

*Governmental Immunity. Massachusetts Tort Claims Act. Notice,* Claim under
Massachusetts Tort Claims Act. *Practice, Civil,* Presentment of claim
under Massachusetts Tort Claims Act. *Negligence,* Proximate cause,
Emotional distress, Comparative.

In a civil action in which a jury awarded damages to the plaintiffs for injuries
they had received as a result of multiple invasions of their apartment,
which they leased from the defendant public housing authority, the judge
erred in allowing the housing authority's motion for judgment notwithstand-
ing the verdict on the basis that the plaintiffs' claim of negligent failure to
change the apartment's locks had not been adequately made in the present-
ment letter, as required under § 4 of G. L. c. 258, the Massachusetts Tort
Claims Act, and that there was insufficient evidence of causation to sup-
port the verdict, where the letter was sufficient to allow the housing author-
ity to undertake the appropriate pretrial factual investigation, legal inquiry,
and settlement analysis, thereby satisfying the purpose of the presentment
statute [133-136]; where the failure to change working locks fell within the
maintenance exception to negligent security claims otherwise barred by the
statute [136-137]; and where, although the question was close, testimony
regarding the home invasions and reasonable inferences that could have
been drawn therefrom supported the jury's verdicts that the housing
authority's failure to change the locks was negligent and proximately
caused two of the home invasions [137].

This court concluded that in an action for injuries that the plaintiffs sustained
as the result of multiple invasions of their apartment, which they leased
from the defendant public housing authority, the plaintiffs were entitled to
recover damages for emotional distress. [138]

This court concluded that, in an action for injuries that the plaintiffs (mother
and son) sustained as the result of multiple invasions of their apartment,
which they leased from the defendant public housing authority, the
$100,000 limit on damages set forth in G. L. c. 258, § 2, should be applied
after, and not before, the reduction in the jury's award for the mother's
own negligence [138-139]; moreover, this court concluded that two
incidents of home invasion were sufficiently separate to allow the mother

---

[1] Samuel Rodriguez.

to recover for injuries arising from the latter incident in addition to $100,000 for the former incident under the G. L. c. 258, § 2, damages cap, where different personal injuries were inflicted in the separate home invasions, which occurred more that two weeks apart [139-141].

CIVIL ACTION commenced in the Superior Court Department on August 23, 1995.

The case was tried before *Martha B. Sosman*, J., and entry of dismissal was ordered by *Leila R. Kern*, J.

*John A. Dalimonte & Jonathan A. Karon* for the plaintiffs.

*John Egan* (*Katherine L. Kenney* with him) for the defendant.

KAFKER, J. Answering special questions, a jury awarded damages to the plaintiffs for injuries they received as a result of multiple invasions of the apartment Carmen Rodriguez[2] leased from the defendant, the Cambridge Housing Authority (CHA). The trial judge allowed the defendant's motion for judgment notwithstanding the verdict (judgment n.o.v.), agreeing with the CHA that the plaintiffs' claim of negligent failure to change the apartment's locks had not been adequately made in the presentment letter, as required under § 4 of G. L. c. 258, the Massachusetts Tort Claims Act, and that there was insufficient evidence of causation to support the verdict. Final judgment entered dismissing the plaintiffs' complaint in its entirety.[3] We reverse so much of the judgment as dismisses the plaintiffs' claims against the CHA, as we conclude (1) that the presentment letter's description of the three attacks, and allegations of the CHA's negligent maintenance of the premises, including the apartment doors and locks, was sufficient to allow the CHA to undertake the appropriate factual investigation, legal inquiry, and settlement analysis, and thereby fulfilled the purposes of the presentment under the statute, and (2) there was sufficient evidence for the jury to find that the CHA's failure to change

---

[2]We refer hereafter to Carmen Rodriguez as Carmen, not out of disrespect, but because her son Samuel Rodriguez is also a plaintiff.

[3]Housing Authority Risk Retention Group, Inc., doing business as Housing Authority Insurance (insurer), was a defendant in the action below. Following the judge's allowance of the motion for judgment n.o.v., the plaintiffs moved to dismiss all claims against the insurer. That motion was allowed. The insurer is not a party to this appeal.

the locks after the first home invasion proximately caused the next two incidents. Finally, we resolve questions raised regarding the application of the G. L. c. 258, § 2, damages cap to the multiple injuries and damages awards in this case.

1. *Background.* a. *The presentment letter.* The plaintiffs' presentment letter, dated January 31, 1995, described three different invasions of their apartment in a three-week period that left Carmen and her sons, Samuel Rodriguez and Carlos Ocasio,[4] hospitalized.[5] The letter included the dates and character of each incident and the types of damages each plaintiff sustained. It alleged that the injuries resulted from the "CHA's failure to provide adequate security" and its breach of various lease provisions. The lease, referenced in and attached to the presentment letter, required the CHA to (1) provide the tenants quiet and peaceful enjoyment of the leased premises; (2) maintain the premises and the development in a safe condition; and (3) repair defective or unsafe conditions or provide alternative living quarters, within twenty-four hours of notice of such conditions. The lease prohibited the tenants from repairing or replacing door locks themselves.

In its recital of the home invasions, the presentment letter stated: "Despite [Carmen's] numerous requests to be transferred . . . the CHA took no action whatsoever to accommodate or do anything to remedy the lack of security and peaceful enjoyment of 112 Jackson Place. Additional locks were not provided . . . nor were the doors and windows made more secure. As a consequence, the Rodriguez family was subject to three home invasions . . . ." The letter did not mention that the twelve year old plaintiff, Samuel, had lost a key to the apartment at the home of his aunt. The aunt was married to Joaquin Luciano; the plaintiffs believed Luciano orchestrated the three attacks on the Rodriguez family.

The three home invasions were described in the presentment letter as follows: "On May 12, 1994, at approximately 9:30

---

[4]Although he was a plaintiff below, Ocasio is not a party to this appeal. We refer herein to Carmen and Samuel as the plaintiffs.

[5]The letter also described other threats and harassment against the family by unnamed people, and the plaintiffs' numerous requests to change apartments, dating back to 1990.

A.M., Carmen Rodriguez was attacked by someone who had broken into her home," who told her (in Spanish), "I am here to kill you." Eventually, she managed to escape through a window and run away. As a result of this attack, she and her doctors and social workers asked the CHA that she "be moved or at least provided with some assurance of safety." Approximately one week later, on May 18, 1994, Carmen was attacked again "in the early morning hours" in her bedroom. The attacker gagged and beat her and "hog-tied" her neck to her feet. As Samuel and his sister attempted to enter their mother's bedroom, the assailant escaped through the window. After discovering his mother hog-tied, Samuel went into shock and was hospitalized from May 18, 1994, to June 3, 1994. Carmen was also hospitalized following the incident.

The third attack occurred on June 4, 1994, the day after Carmen and Samuel were discharged from the hospital. They returned to their apartment with Samuel's older brother, Carlos Ocasio, and heard an intruder leaving as they entered. According to the letter, the intruder wielded a knife and inflicted serious injuries on Ocasio, whose hand was "nearly severed" at the wrist. Although not explained in the letter, this confrontation occurred outside the apartment, when Ocasio chased down Joaquin Luciano, who was seen walking in the vicinity of the apartment immediately after the plaintiffs entered.

b. *Evolution of the case.* (i) *Pretrial.* The presentment letter triggered an investigation by Allied Adjustment Service (Allied) on behalf of the CHA. Allied interviewed the plaintiffs and the CHA's building manager. The investigation revealed a work order prepared by the manager dated June 6, 1994, two days after the third attack, which stated, "Tenant wants locks changed — thinks unauthorized person has key."

The plaintiffs filed their complaint in Superior Court on August 23, 1995. In paragraph twenty-six of the complaint, the plaintiffs stated that "[o]n or about January 31, 1995, a detailed letter was sent to CHA demanding an offer of settlement." Paragraph twenty-six also referenced a response from Allied indicating it was investigating the matter. After detailing the three incidents, the complaint alleged negligence and failure to comply with the lease terms. The plaintiffs alleged that the

"development was not a safe place . . . and that security was needed to make said premises safe and free from danger." The complaint did not mention specifically the doors, windows, or locks at the apartment.

The CHA moved to dismiss, arguing that the claims for negligent security were barred under G. L. c. 258, § 10(*h*) and (*j*). The CHA did not allege inadequate presentment. In their opposition to the motion, the plaintiffs referred to the CHA's "failure to maintain the doors, windows, locks and keys." They alleged that the CHA's "negligent installation and repair of the doors, windows, locks and keys were the original cause of the harmful condition that led to the attacks upon the [p]laintiffs." A Superior Court judge denied the motion. She concluded that although a housing authority's decision as to what security measures to employ on its premises is discretionary and thus protected under G. L. c. 258, § 10(*b*), "[t]he claims in . . . the complaint that the CHA promised to provide quiet and peaceful enjoyment and to repair unsafe conditions within 24 hours or provide alternative accommodations and reasonable moving expenses ma[d]e it impossible . . . to determine that as a matter of law there is *no* set of facts which would entitle the plaintiff[s] to relief."

Thereafter, the CHA moved for partial summary judgment, arguing again that the claims of inadequate security were barred by G. L. c. 258, § 10(*h*) and (*j*). The CHA expressly did not, however, seek summary judgment on claims "that the criminal assaults were caused by the CHA's negligent maintenance of its premises; specifically, doors and/or windows." Once again, the CHA made no challenge to the adequacy of the presentment. A different judge granted summary judgment on any claims based on a "theory of negligent security beyond negligence in the maintenance of the physical security of the unit (i.e., the locks) and failure to provide alternative accommodations until the locks were fixed," ruling such claims were barred by § 10(*j*).

The plaintiffs noted in their opposition to the CHA's motion for partial summary judgment that Cambridge police Detective Lester Sullivan "met with [the building manager] and instructed him to change the locks on the doors," but the difference between negligent maintenance of defective locks and negligent

maintenance of locks because of a lost key was not otherwise addressed by the parties. In her ruling, the judge indicated that "[t]he police investigating the incident recommended to the . . . manager that the door locks be changed. The locks were not changed, and no repairs were done." She further noted that "the officer's recommendation appears to be based on concern that the intruder may have had a key. The officer's recommendation does not appear to be based on any observations about a malfunctioning door lock."

The locks, but not the possibility of a lost key, were a focal point of the parties' joint pretrial memorandum. The plaintiffs complained of inoperable door locks and locks that were loose and needing repair, and stated that the CHA "did nothing to repair or replace the window or door locks creating this unsafe condition," even though the CHA was on notice of the problem. The CHA contended that door and window locks were in working order at all times and that the CHA had not been notified of any problems with the locks, windows, or doors prior to June 4, 1994.

In November, 1998, nine months before trial, the plaintiffs supplemented their answers to the CHA's interrogatories. They stated that their expert witness, Joseph Griffin, was expected to testify that the CHA was negligent in failing to replace door locks after its agent was told by Detective Sullivan, several days before the second attack, "that he believed that an unauthorized person may have had a key to [the residence] and/or that the door locks should be replaced." Griffin would further testify that "[d]espite knowledge of this first attack, and after [D]etective Sullivan recommended that the door locks be changed, [the] CHA again acted negligently by failing to do anything to maintain these locks."

(ii) *Trial.* Amid much evidence of malfunctioning door and window locks, testimony at trial pointed to the intruder's unauthorized entry into the apartment with a lost key. On cross-examination, Samuel testified that he had lost his key "once or twice" at the apartment of his aunt, who was married to the man suspected of orchestrating the attacks. Detective Sullivan testified that he had advised the CHA to change the apartment's door locks after the first incident. The plaintiffs' expert opined

that the intruder in the first and third invasions had used a key but had gained entry through a window in the second attack.

The trial judge, concerned the CHA may not have had adequate notice of a claim stemming from the possibility of a lost key, and doubtful that the CHA had a legal obligation, at least before the May 12 invasion, to replace functioning door locks, formulated a series of special questions on the jury verdict form. The questions divided the plaintiffs' negligent maintenance claims into three types: (1) failure to repair malfunctioning or inoperable window locks, (2) failure to repair malfunctioning or inoperable door locks, and (3) failure to change door locks. The jury found the CHA negligent only under the third theory, failure to change door locks. It found this negligence proximately caused the May 18 and June 4 incidents only.[6]

After the verdict, the trial judge granted the CHA's motion for judgment n.o.v. Calling the question "close," the judge ruled that changing the door lock because of the possibility of a lost key came within the maintenance exception of G. L. c. 258, § 10(j)(3). She concluded, however, that "[n]owhere did [the presentment] letter claim or even suggest that what plaintiffs were really complaining about was an intruder who had a key to their apartment whose intrusions could have been prevented if [the] CHA had promptly responded to a May 1994 request to change their door lock." She also ruled that there was insufficient evidence to establish "that failure to change a working lock had any causal connection to either the May 18 incident or the June 4 incident."

On appellate review, we look to "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff[s].' " *Makynen* v. *Mustakangas*, 39 Mass. App. Ct. 309, 311 (1995), quoting from *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978). *Osborne* v. *Hemingway Transp., Inc.*, 28 Mass. App. Ct. 944 (1990).

2. *Discussion.* a. *General Laws c. 258, § 4.* "The purpose of

---

[6]The jury found the CHA sixty-eight percent negligent for the May 18 incident and Carmen thirty-two percent negligent. For the June 4 incident, it found the CHA seventy-six percent negligent and Carmen twenty-four percent negligent.

the presentment requirement is to 'ensure[ ] that the responsible public official receives notice of the claim so that that official can investigate to determine whether or not a claim is valid, preclude payment of inflated or nonmeritorious claims, settle valid claims expeditiously, and take steps to ensure that similar claims will not be brought in the future.' " *Martin* v. *Commonwealth*, 53 Mass. App. Ct. 526, 529 (2002), quoting from *Lodge* v. *District Attorney for the Suffolk Dist.*, 21 Mass. App. Ct. 277, 283 (1985). In interpreting the presentment statute, the courts have attempted to strike an "appropriate balance . . . between the public interest in fairness to injured persons and in promoting effective government." *Whitney* v. *Worcester*, 373 Mass. 208, 216 (1977). The presentment letter should be "precise" in identifying the basis of the claim; it cannot be "so obscure that educated public officials should find themselves baffled or misled with respect to" the claim asserted. *Gilmore* v. *Commonwealth*, 417 Mass. 718, 723 (1994).[7]

The presentment letter in the instant case described the three incidents in detail. It also set out a negligent maintenance claim for failure to provide additional locks, or make doors and windows more secure, and for failure to maintain the premises in a safe and secure fashion generally. It did not, however, expressly state that the CHA was negligent for failing to change working locks. Nor did it reference the possibility of lost keys.

In cases in which presentment letters were found to be inadequate, the divergence between the letter and the claim advanced at trial is more significant than the one that the CHA claims here. For example, in *Richardson* v. *Dailey*, 424 Mass. 258, 259, 261-262 (1997), the plaintiffs in their complaint sought to recover for negligent design by the city of Boston of a jail cell, while the presentment letter claimed negligence based on the failure of employees of the Commonwealth to respond to the prisoner's request for help for his "drug sickness." In *Wightman* v. *Metheun*, 26 Mass. App. Ct. 279,

---

[7]The cases also refer to "strict compliance" with the presentment statute. In *Martin* v. *Commonwealth*, 53 Mass. App. Ct. at 529, this court stated that the " 'strict compliance' precept is concerned more with whether presentment has been made to the proper executive officer . . . in a timely fashion . . . than with the content of the presentment."

281-282 (1988), the plaintiffs' presentment letter claimed negligent supervision of a playground where a school yard bully injured another child, but the complaint alleged negligent medical response. In *Tambolleo* v. *West Boylston*, 34 Mass. App. Ct. 526, 532-533 (1993), the presentment letter cited intentional misconduct by a police officer, while the legal claim pursued was negligent supervision of the officer. In *G & B Assocs., Inc.* v. *Springfield*, 39 Mass. App. Ct. 51 (1995), the presentment letter alleged negligent nondisclosure of information regarding a municipal land sale, while the complaint alleged negligent misrepresentation. In several cases, the presentment letters described only claims invalid under G. L. c. 258, § 10, while the plaintiffs later brought claims alleging negligence not barred by the statute. See *Gilmore* v. *Commonwealth*, 417 Mass. at 723 n.6, and cases cited.

Where presentment letters have not been so deficient or obscure, our courts have found them adequate despite some imprecision. In *Gilmore* v. *Commonwealth*, *supra* at 722, where the presentment letter notified the defendants of the decedent's estate's suit for wrongful death, the court agreed with the trial judge that "a conclusion that the remaining plaintiffs . . . were making a claim for negligent infliction of emotional distress was not a conclusion only those with the most active imaginations could be expected to draw from the facts the plaintiffs recited." In *Martin* v. *Commonwealth*, 53 Mass. App. Ct. at 530, this court came to a similar conclusion where a mother's emotional distress and loss of consortium claims did not appear in the presentment letter, which detailed her children's negligent lead paint removal claims. In both cases the courts stressed that the facts underlying the claims were fully presented. *Gilmore* v. *Commonwealth*, *supra* (presentment letter sets out "entire fact pattern" of murder committed by prisoner on furlough and "alleged wrongful acts of county and State officials"). *Martin* v. *Commonwealth*, *supra* (letter identified "precisely and unequivocally the factual basis of the claims"). In the instant case, however, a potentially important fact — the lost key and the possibility that it was used by the home invaders — is absent from the presentment letter.

Nevertheless, the letter described the three home invasions

and the resulting injuries in detail. It also directed the CHA's attention to the apartment's doors and locks. The relevant conduct of the CHA being complained of, i.e., whether it maintained the property in a secure manner, was clear. The presentment letter also triggered and focused an investigation which uncovered the work order identifying the issue of the lost key. We conclude that the letter was sufficient to allow the CHA to undertake the appropriate pretrial factual investigation, legal inquiry, and settlement analysis, and that it thereby satisfied the purpose of the presentment statute. *Gilmore* v. *Commonwealth*, 417 Mass. at 720-721. *McAllister* v. *Boston Hous. Authy.*, 429 Mass. 300, 305 n.7 (1999). *Martin* v. *Commonwealth*, 53 Mass. App. Ct. at 532.

We recognize that the possibility of a lost key being used to enter the premises served to refine and modify the inquiry whether the CHA's property maintenance was negligent. Nevertheless, it is not unusual for a case to evolve as discovery proceeds. Moreover, how the invader or invaders gained access to the apartment remained in dispute throughout discovery and trial. The plaintiffs continued to pursue their closely related original negligent maintenance theory, that the invasions occurred as a result of defective doors and windows, and door and window locks. This was not a case where the plaintiffs "sandbagged" the CHA by concealing the factual and legal basis of their argument until it was too late for the defendant to mount an effective defense.[8]

b. *Maintenance of property exception.* The CHA also contends that the maintenance of property exception to negligent security claims is not broad enough to include the failure to change working locks. G. L. c. 258, § 10(*h*), (*j*). We conclude, as did the trial judge, that the failure to change working locks here falls within the maintenance exception to negligent security claims otherwise barred by the statute. Where the lease precludes a tenant from changing the locks herself, she must rely on the housing authority to perform this function. Where

---

[8]We also note the CHA's failure to raise the inadequate presentment argument before the directed verdict stage, despite its awareness much earlier of the possibility of a misplaced key and the plaintiffs' stated intention to rely on Detective Sullivan's recommendation that the locks be changed.

the housing authority is on notice that an unauthorized person may have a key to enter the premises, the lock no longer serves its necessary purpose. Changing the lock then becomes a maintenance of property function and is no longer a discretionary security question.[9]

c. *Causation.* The judge concluded that there was insufficient evidence of a causal connection between the CHA's failure to change locks and the May 18 and June 4 home invasions for which the jury awarded damages. We conclude that proof of causation was adequate to support the jury's verdict. Although the plaintiffs' trial presentation was scattershot, evidence of the three home invasions occurring within a three-week period was ample. The plaintiffs also demonstrated that a police detective informed the CHA after the first incident that it should consider changing the locks. Changing the locks would have addressed both the possibility of someone entering with a key and through doors that did not lock properly.

There was also testimony that Samuel had "once or twice" lost a key. The plaintiffs claimed that they had locked the doors and windows on the relevant occasions. The CHA submitted proof that the door and window locks were in working order. Detective Sullivan reported no evidence of forced entry. The intruder entered without being observed on each occasion and came upon Carmen suddenly, twice, without alerting her. There was evidence that the same intruder committed the first and second assaults and that all three incidents were orchestrated by the same person. On this evidence, the jury could have concluded, despite the plaintiffs' own expert's opinion, that the intruder in the second incident entered via the door and not through a first-floor window. There was also testimony from Carlos Ocasio that in May, before the second attack, he asked the building manager to change the locks. In sum, although the question is close, testimony regarding the home invasions and reasonable inferences that could be drawn therefrom supported the jury's verdicts that the CHA's failure to change the locks was negligent and proximately caused the last two invasions.

---

[9]Prior to the passage of the negligent maintenance exception in 1993, the case law drew a similar distinction. See, e.g., *Sanker* v. *Orleans,* 27 Mass. App. Ct. 410, 412-413 (1989); *Tyron* v. *Lowell,* 29 Mass. App. Ct. 720, 724 (1991); *Wheeler* v. *Boston Hous. Authy.,* 34 Mass. App. Ct 36, 41 (1993).

d. *CHA's remaining claims.* We conclude that Samuel, twelve years old when the attacks took place, may recover for emotional distress resulting from his hospitalization after discovery of his mother hog-tied and beaten on her bed on May 18. We also conclude that there is an adequate evidentiary basis to support Carmen's recovery of $30,000 in emotional distress damages for the June 4 incident.

e. *Application of G. L. c. 258, § 2, damages cap.* The jury determined that $170,000 would fairly and adequately compensate Carmen for all injuries and damages proximately caused by the May 18, 1994, incident and found her thirty-two percent negligent and the CHA sixty-eight percent negligent. The jury determined that $30,000 would fairly and adequately compensate her for all injuries and damages caused by the June 4, 1994, incident and determined with respect to this incident that she was twenty-four percent negligent and the CHA was seventy-six percent negligent. The CHA argues that G. L. c. 258, § 2, limits the damages Carmen may recover for both incidents to $90,800, or alternatively, to no more than $100,000.

General Laws c. 258, § 2, as inserted by St. 1978, c. 512, § 15, provides in pertinent part that "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances, except that public employers shall not be liable . . . for interest prior to judgment or for punitive damages or for any amount in excess of one hundred thousand dollars."

The CHA arrives at the $90,800 figure by first reducing the $170,000 award to $100,000 and then applying the thirty-two percent comparative negligence reduction to reach $68,000. The CHA applies the twenty-four percent comparative negligence reduction to the $30,000 award to reach $22,800. It then adds $68,000 to $22,800 for a total of $90,800.

The CHA has incorrectly assumed that $100,000 rather than $170,000 is the amount on which the thirty-two percent comparative negligence is assessed. The statute states that "[p]ublic employers shall be liable for injury . . . *in the same*

*manner and to the same extent as a private individual . . .* except that public employers shall not be liable . . . for any amount in excess of one hundred thousand dollars" (emphasis added). G. L. c. 258, § 2. If this were a private employer, the "manner" for calculating the award would be to deduct the thirty-two percent comparative negligence from the total damages awarded to Carmen ($170,000 for the May 18 incident), leaving the amount of $115,600. The public employer would then "not be liable for any amount in excess of one hundred thousand dollars." We conclude that the statutory cap should be applied after, and not before, the reduction for a plaintiff's own negligence. See, e.g., Glannon & Gordon, Practice and Procedure Under the Massachusetts Tort Claims Act (G. L. c. 258), 71 Mass. L. Rev. 61, 80 & n.226 (1986). See also *Thomas* v. *Tulsa,* 766 P.2d 339 (Okla. 1988). Cf. *Stuart* v. *Brookline,* 412 Mass. 251, 257 (1992) ("Nothing in G. L. c. 258 suggests that settlements with joint tortfeasors should be deducted from the $100,000 public employer liability cap rather than from the total damages awarded to the plaintiff").

The CHA also argues that the total amount awarded to Carmen cannot exceed $100,000 because her damages arose from the single negligent act of the CHA's failure to change the door locks, and the statute caps the over-all liability per plaintiff to $100,000. The plaintiffs respond that Carmen was injured by two separate and distinct acts of negligence on two different occasions, and therefore she is entitled to recover up to $100,000 for each event.

The two different injuries suffered by Carmen occurred on dates separated by more than two weeks. They involved discrete acts of violence and resulted in different injuries to her. On May 18, she was left hog-tied on her bed by someone who entered the apartment; on June 4, she was not physically touched but saw her son slashed with a knife when he chased a person who he believed was the intruder outside the apartment. The intruders in the two incidents were apparently different individuals.

The proximate cause of both injuries was the CHA's negligent failure to change door locks at the apartment. The jury, however, assessed the negligence giving rise to the injuries sustained in each incident differently, attributing more negligence to Carmen

for the May 18 incident than for the June 4 incident, apparently reflecting their sense that the CHA's breach of its duty grew more serious with each home invasion.

How the statutory cap applies in this context is not clear from the case law. In *Irwin* v. *Ware*, 392 Mass. 745, 772 (1984), the court stated that the cap "ensures that a meaningful recovery will be available to victims of public employee negligence, while simultaneously limiting a public employer's exposure to excessive liability." That case involved a single incident, a car accident proximately caused by police officers' failure to remove an intoxicated driver from the roadways. There were multiple plaintiffs, including those with multiple claims. The court concluded that the statute did not cap the amount per incident at $100,000, but did cap the amount recoverable on a per plaintiff basis, in this single incident case, to $100,000. *Id.* at 769-772. The $100,000 per plaintiff cap applies regardless of the number of claims per plaintiff per incident. The court emphasized that the alternative urged by the plaintiff, a per claim or per "count" liability limit, "would hinge total recovery on the resourcefulness of a plaintiff's counsel." *Id.* at 771. The court interpreted the word "claim" as used in G. L. c. 258, § 2, to mean "a demand for all damages arising from a tort to one person, not . . . to each count of negligence." *Id.* at 772. Not raised in *Irwin*, however, was the question of the application of the cap to plaintiffs who suffer separate injuries inflicted on different dates.[10]

We recognize that this is a close case because we are not dealing with unrelated torts. We nonetheless conclude that the

---

[10]Nor have other cases interpreted the cap in this context. In *Nemet* v. *Boston Water & Sewer Commn.*, 56 Mass. App. Ct. 104 (2002), there was "serial flooding" at the plaintiffs' residence, but recovery was sought based on the property damage caused by the most serious of the floods, and the issue whether plaintiffs could recover for other incidents, when they had received $100,000 for one incident, was not raised. We do, however, have the benefit of the somewhat analogous cases construing the number of occurrences under insurance policies. See *Slater* v. *U.S. Fid. & Guar. Co.*, 379 Mass. 801 (1980); *Worcester Ins. Co.* v. *Fells Acres Day Sch., Inc.*, 408 Mass. 393, 416-417 (1990); *RLI Ins. Co.* v. *Simon's Rock Early College*, 54 Mass. App. Ct. 286 (2002). Nonetheless, the language of particular policy provisions and the canons of construction for interpreting insurance policies do place limits on the utility of this analogy. See, e.g., *Slater* v. *U.S. Fid. & Guar. Co.*, *supra* at 808.

two incidents were sufficiently separate to allow Carmen recovery for the June 4 injury in addition to the $100,000 for the May 18 injury. Most important, different personal injuries were inflicted in separate home invasions occurring more than two weeks apart. The separateness of these injuries does not depend on the resourcefulness of counsel. *Irwin, supra* at 771. The jury were asked, without objection, to consider separately the proximate cause of the injuries occurring on the two dates, as well as the damages arising therefrom, and they did so. Although the negligence could be described as ongoing, it in fact changed with each incident, as each attack should have brought the CHA heightened awareness of the problem. Cf. *Worcester Ins. Co.* v. *Fells Acres Day Sch., Inc.*, 408 Mass. 393, 417 (1990) (in rejecting insurer's attempt to argue that child abuse at day care center constituted single occurrence under insurance policy, court stated that "we have rejected attempts by insurers to characterize seemingly discrete events as emanating from a single, ongoing cause").

By June 4, the CHA had been notified of the two prior home invasions and alerted to the possible solution (changing the locks). It also had both the opportunity and the ready capacity to fix the problem. Cf. *Slater* v. *U.S. Fid. & Guar. Co.*, 379 Mass. 801, 806-807 (1980) ("when the cause is interrupted, either by an independent cause, or by the actor regaining control over the causing factor, courts usually find that there is more than one 'occurrence' or 'accident' "). Such a distinct injury justifies an independent, "meaningful" recovery. This recovery is also not "excessive" when the public employer neglected a reasonable opportunity to eliminate the proximate cause of the injuries in the time between them. *Irwin* v. *Ware*, 392 Mass. at 772.

3. *Conclusion.* The portion of the judgment that dismisses the claims of Carmen and Samuel against the CHA is reversed, and judgment shall enter on the verdicts on those claims, as modified by the reductions set forth in this opinion. In all other respects, the judgment is affirmed.

*So ordered.*