[Cite as *Guiliani v. Shehata*, 2014-Ohio-4240.]

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| PHILIP GUILIANI, | : | APPEAL NOS. C-130837 |
| | | C-140016 |
| Plaintiff-Appellant/ | : | TRIAL NO.  A-1105500 |
| Cross-Appellee, | | |
| | : | |
| vs. | | *O P I N I O N.* |
| | : | |
| WAGIH M. SHEHATA, M.D., | | |
| | : | |
| Defendant-Appellee/ | | |
| Cross-Appellant. | | |

Civil Appeals From: Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  September 26, 2014

*White Getgey and Meyer Co., L.P.A.*, *Ronald A. Meyer* and *Brian Goldwasser*, for Plaintiff-Appellant/Cross-Appellee,

*Lindhorst and Driedame Co., L.P.A., Michael F. Lyon, Bradley D. McPeek* and *Laurie McCluskey*, for Defendant-Appellee/Cross-Appellant.

Please note:  this case has been removed from the accelerated calendar.

**FISCHER, Judge.**

{¶1} In this medical-malpractice case, the jury found that defendant-appellee/cross-appellant Dr. Wagih Shehata had failed to timely diagnose plaintiff-appellant/cross-appellee Philip Guiliani's colon cancer. It awarded Guiliani $1,000,000 in noneconomic damages. The jury apportioned 70 percent liability to Dr. Shehata and 30 percent liability to Guiliani. The trial court reduced the award against Dr. Shehata from $1,000,000 to $700,000 based upon the jury's apportionment of liability. It further reduced the award against Dr. Shehata to $250,000 based upon the damage limitation in R.C. 2323.43.

{¶2} Both Guiliani and Dr. Shehata have appealed the trial court's judgment. Their appeals require this court to address for the first time in Ohio the interplay between R.C. 2315.35, the comparative-negligence statute, and R.C. 2323.43 the damage-cap statute, and to address the two-tiered damage limitation in R.C. 2323.43. They also require this court to address the trial court's decision to exclude Guiliani's medical bills and to admit expert testimony from a medical oncologist. Based upon our review of the record and the law, we affirm the trial court's judgment.

### Evidence Presented at the Jury Trial

{¶3} In 2008, Guiliani, who was 60 years old, was treating with Dr. Stephen Brewer, a urologist. Dr. Brewer ordered a screening test for prostate cancer, which came back "abnormal." Dr. Brewer recommended that Guiliani have a biopsy as soon as possible, but Guiliani did not have the biopsy done until 18 months later. When Guiliani underwent the biopsy in June 2009, it showed prostate cancer.

{¶4} After reviewing his treatment options, Guiliani chose brachytherapy, a procedure where a medical team inserts radioactive pellets or seeds into the prostate. Dr. Brewer referred Guiliani to Dr. Shehata, a radiation oncologist. Guiliani first saw Dr.

Shehata on July 9, 2009. After consulting with Dr. Shehata, Guiliani elected to treat the prostate cancer with the implantation of radioactive seeds. The procedure was originally scheduled for July 28, but Guiliani rescheduled the procedure for September 8, 2009, so that he could proceed with an elective knee surgery.

{¶5} Prior to the seed-implantation procedure, Guiliani was seen by Dr. Dain Wahl, a primary-care physician, on August 21, 2009, for complaints of rectal bleeding. After examining Guiliani, Dr. Wahl prescribed Proctofoam to help with the bleeding. He also called a gastroenterologist and "set up" a colonoscopy for August 24, 2009. Dr. Wahl testified that he did not know if Guiliani had followed his recommendation to have the colonoscopy. Guiliani testified that he was unaware the colonoscopy had been scheduled because Dr. Wahl talked to him about hemorrhoids. He presented testimony from the office manager who testified that the procedure had not been written in the gastroenterologist's appointment book.

{¶6} Guiliani's seed-implant procedure took place on September 8, 2009. As part of the procedure, Dr. Shehata ordered a CT scan to be performed. The CT scan was interpreted by a radiologist. The radiologist's report was made available electronically, and was accessible to all physicians, including Dr. Shehata, the ordering physician. Contained within the report was an indication of something unusual in the mid-pelvis, abutting the colon. Specifically, Dr. Reinhart, the radiologist wrote:

> Low density mass-like legion within the mid-pelvis abutting the colon. This could represent complex fluid collection or could represent low density neoplastic mass. If this has not been previously evaluated, then further evaluation with CT of the abdomen and pelvis with oral and intravenous contrast would be suggested.

{¶7}     Dr. Reinhart recommended that Guiliani undergo further evaluation.  Dr. Shehata never presented the results of the CT scan to Guiliani.  Dr. Shehata testified that he never received the report.   An information technology technician from Christ Hospital testified that someone with Dr. Shehata's password had accessed the CT scan and report on September 15, 2009.

{¶8}     Dr. Shehata testified that he did not look at the findings because the CT scan was not being used to diagnose Guiliani, but to map the placement of the seeds.  Thus, he was uninterested in the radiologist's interpretation of the image. Dr. Shehata further testified that he would have expected the radiologist to call him based upon his report, which had noted the abdominal abnormality as an incidental finding and had suggested a follow-up study.   Dr. Shehata further testified that following the seed-implant procedure, he saw Guiliani on September 22 and November 9, 2009. Guiliani did not complain of rectal bleeding at either appointment and Guiliani never told him that he had seen Dr. Wahl for rectal bleeding in August 2009.

{¶9}     Over the next several months, Guiliani began to experience abdominal discomfort which he had not previously experienced.  On March 23, 2010, Dr. Shehata advised Guiliani to consult a gastroenterologist regarding his GI symptoms and a possible colonoscopy.  On April 5, 2010, Guiliani followed up with his primary care doctor, Edward Jung.   Dr. Jung suggested a CT scan of the abdomen and pelvis.  On April 8, 2010, a CT scan of the abdomen and pelvis was performed.  The April 8, 2010 CT scan showed a large mass in Guiliani's pelvis involving the sigmoid colon, severe bilateral hydronephrosis and hydroureter secondary to a large pelvic mass, and thickening in the urinary bladder which was suspicious for tumor involvement.

{¶10}   Guiliani was referred to Janice Rafferty, M.D., a colorectal surgeon, who, along with oncologist Dr. Drosick, began treating Guiliani.   Guiliani underwent

chemotherapy and radiation to shrink the tumor. In September 2010, Guiliani traveled to Houston, Texas to undergo surgical treatment at M.D. Anderson. Guiliani's bladder, ureters, and rectum were removed, along with a significant portion of his colon. Guiliani was left with a permanent colostomy and a permanent urostomy.

{¶11} Dr. Rafferty testified that between September 2009, and April 2010, the tumor in Guiliani's pelvis grew from "tiny to huge." She further testified that had Guiliani been referred to her following the September 8, 2009 CT scan, the tumor could have been surgically excised and Guiliani would have been able to undergo a colectomy. Guiliani would not have needed a colostomy or urostomy. Guiliani's rectum would have been preserved.

{¶12} Guiliani also presented expert testimony from Dr. Ross Donehower, a board-certified oncologist. Dr. Donehower testified that Dr. Shehata was negligent in failing to read and follow up on the September 2009 CT scan, and that his negligence proximately caused harm to Guiliani, resulting in substantial delay in the diagnosis of the mucinous adenocarcinoma of the colon. He testified that had referral and diagnosis been timely, Guiliani would not have required a pelvic exteneration, nor would Guiliani have required a permanent colostomy or urostomy. Dr. Donehower admitted, however, that had a colonoscopy been performed on Guiliani in August 2009, it would have diagnosed Guiliani's colon cancer.

{¶13} Dr. Shehata presented expert testimony from Dr. Brewer, a urologist, and Dr. David Harris, a physician who is board certified in internal medicine, medical oncology, and hematology. Neither Dr. Brewer nor Dr. Harris testified as to the standard of care for a radiation oncologist. Both Dr. Brewer and Dr. Harris testified that colon cancer grows slowly and that it would have taken many years for Guiliani's cancer to grow to the size that it had by the time of the April 2010 CT scan. Dr. Harris

disagreed with Dr. Rafferty's opinion that the size of Guiliani's cancer had gone from "tiny to huge" in the six months between the CT scans in September 2009, and April 2010. He testified that Guiliani would have required the same surgery regardless of whether the cancer had been diagnosed in September 2009, or April 2010. Both Drs. Harris and Brewer testified that Guiliani had a colonoscopy two and one-half years earlier. The gastroenterologist who had performed the colonoscopy had found a polyp, which would have mandated that Guiliani return within six months. Guiliani, however, did not. Dr. Harris testified that had Guiliani followed through with this recommendation and had a colonoscopy, it would more likely than not have disclosed his colon cancer.

### Jury Verdict

{¶14} The jury found in favor of Guiliani and awarded him $1,000,000 in damages for noneconomic loss. The jury answered interrogatories, finding that Dr. Shehata was negligent and that his negligence was a proximate cause of injury to Guiliani. The jury further found that Guiliani was 30 percent negligent and Dr. Shehata was 70 percent negligent. As a result, the trial court reduced the jury's award to $700,000. It then capped Guiliani's damages at $250,000 pursuant to R.C. 2323.43. The trial court also awarded Guiliani prejudgment interest.

### Guiliani's Appeal and Dr. Shehata's Cross-Appeal

{¶15} Guiliani has timely appealed, raising two assignments of error. He argues the trial court erred by failing to apply the higher damage cap of $500,000 in R.C. 2323.43, and by excluding his medical bills. In his cross appeal, Dr. Shehata argues the trial court erred by applying R.C. 2315.35, the comparative-fault statute, before applying the $250,000 damage-cap provision in R.C. 2323.43, and by permitting expert testimony from Dr. Donehower.

6

### The $250,000 Damage Cap Applies

{¶16}   In his first assignment of error, Guiliani argues the trial court erred by failing to apply the higher damage cap of $500,000 in R.C. 2323.43(A)(3).

{¶17}   R.C. 2323.43 limits a plaintiff's noneconomic damages in a medical-malpractice action.   The statute provides for two levels of caps on noneconomic damages.  The basic cap is the larger of $250,000 or three times the economic damages, subject to a maximum of $350,000 per plaintiff and a maximum of $500,000 per occurrence.  *See* R.C. 2323.43(A)(2).  The statute also provides for a higher cap of $500,000 per plaintiff and $1,000,000 per occurrence.  But this higher cap applies only if the plaintiff has sustained certain catastrophic injuries specifically identified as:

(a) Permanent and substantial physical deformity, loss of use of a limb, or

loss of a bodily organ system;

(b) Permanent physical functional injury that permanently prevents the

injured person from being able to independently care for self and perform

life sustaining activities.

R.C. 2323.43(A)(3).

{¶18}   Guiliani argues that the trial court erred by failing to apply the higher cap of $500,000 when he presented expert testimony that he had to undergo a pelvic exteneration, which included the removal of his bladder, a large part of his colon and his rectum, thereby necessitating a colostomy and a urostomy.  He argues that the loss of these two organs and the addition of the colostomy and urostomy bags left him with the loss of a bodily organ system and a substantial physical deformity.

{¶19}   Giuliani further argues that the trial court's determination that the jury was required to make a factual finding to support the higher damage cap is not supported by the plain language of R.C. 2323.43.  He relies upon R.C. 2323.43(B),

which provides that the jury verdict must be accompanied by answers to the following interrogatories:

(1) The total compensatory damages recoverable by the plaintiff;

(2) The portion of the total compensatory damages that represents damages for economic losses;

(3) The portion of the total compensatory damages that represents damages for noneconomic loss.

{¶20} Giuliani argues that the legislature's specific inclusion of these interrogatories reveals its intent that the list be exclusive. Thus, he argues that he was not required to submit an interrogatory to be entitled to the higher damage cap of $500,000. Giuliani further argues that because the jury found that Dr. Shehata's negligence proximately caused Giuliani's injuries, the jury's general verdict, in the absence of specific jury interrogatories, is a finding in his favor on all the issues presented in the case. *See Stephenson v. Upper Valley Family Care, Inc.,* 2d Dist. Miami No. 2009CA38, 2010-Ohio-4390, ¶ 49.

{¶21} The problem with Guiliani's argument is that it focuses solely on R.C. 2323.43(B) and ignores other sections in the damage-cap statute, which support an interpretation that the applicability of the higher cap is a factual issue that a jury must determine. R.C. 2323.43(C)(1) provides in pertinent part: "Division A of this section shall be applied in a jury trial *only after* the jury has made its factual findings and determination as to the damages." (Emphasis added.) The determination of damages arguably comes under subsection (B) of the statute. The question then becomes what factual findings is the statute referring to that the jury must make? Under the statute, the factual findings referenced in (C)(1) relate back to the catastrophic damage limits set forth in R.C. 2323.43(A)(3)(a) and (b).

{¶22} Requiring a jury interrogatory on the higher cap is also consistent with federal case law interpreting the more general tort-cap statute, R.C. 2315.18, which contains the same two-tiered damage cap limitation in R.C. 2323.43 for noneconomic losses: a standard $250,000/$350,000 cap for noneconomic loss, and a higher cap of $500,000 if the plaintiff sustains the same catastrophic injuries that are listed in R.C. 2323.43(A)(3). In *Ohle v. DJO, Inc.*, No. 1:09-cv-02794, 2012 U.S. Dist. LEXIS 140020, *3 (N.D. Ohio Sept. 28, 2012), the Northern District of Ohio, in interpreting the catastrophic damage cap in R.C. 2315.18, held that once the plaintiff crosses the evidentiary threshold of summary judgment on the applicability of the noneconomic damage maximum, the issue should be one for the jury to decide.

{¶23} In reaching this conclusion, the *Ohle* court relied upon the Ohio Supreme Court's decision in *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 240, ¶ 30-42, which had upheld the $500,000 noneconomic damage cap in R.C. 2315.18 against a variety of constitutional attacks, with support from Ohio's Pattern Jury Instructions and federal case law. First, with respect to the *Arbino* decision, the *Ohle* court noted that the Ohio Supreme Court had "made clear that noneconomic damages maximum is constitutional only '[s]o long as the fact-finding process is not intruded upon and the resulting findings are not ignored or replaced by another body's finding.' " *Ohle* at *7, quoting *Arbino* at ¶ 37. The *Arbino* court had emphasized that the statutory cap was constitutional because the trial court could not "impose its own factual determination regarding what a proper award might be," rather, its implementation of the noneconomic damages maximum must be analogous to the use of a remitter or application of treble damages. *Ohle* at *8, quoting *Arbino* at ¶ 37. Thus, the trial court may, as a matter of law, apply the limit to alter the amount of money awarded to a plaintiff for noneconomic damages,

but it cannot disturb the jury's underlying factual determinations. *Ohle* at *8, citing *Arbino* at ¶ 40.

{¶24} The *Ohle* court further noted that after the General Assembly had enacted the nonecomonic damages cap, the Ohio Judicial Conference had republished the Ohio's Pattern Jury Instructions ("O.J.I.") so that "jurors must find whether they found the plaintiff to be permanently and substantially physically deformed." *See Ohle* at *9; *see also* OJI-Civil 315.01(6). Thus, O.J.I. "supported having the jury, and not the judge, decide the issue of the nature of a plaintiff's injury." *Id.* Finally, the *Ohle* court noted that the federal court in *Bransteter v. Moore*, No. 3:09 CV 2, 2009 U.S. Dist. LEXIS 6692, *2 (N.D. Ohio Jan. 21, 2009), had agreed that issues concerning the nature and severity of a plaintiff's injury should be resolved by jury interrogatory at trial. *Ohle* at *9. Therefore, the *Ohle* court held that the jury was in the best position to determine the nature of the plaintiff's injuries, and denied a motion for summary judgment on the applicability of the cap statute. *Ohle* at *10.

{¶25} After reviewing the plain language of the statute and the case law interpreting the general tort-cap statute, we agree with Dr. Shehata that in this case any determination that Guiliani had suffered injuries necessitating application of the higher cap amount was a factual finding that had to be made by the jury. We, therefore, overrule Guiliani's first assignment of error.

### Medical Bills

{¶26} In his second assignment of error, Guiliani argues the trial court erred in excluding the medical bills from his treatment at M.D. Anderson on the basis that Guiliani should have presented expert testimony to distinguish between the costs incurred and any marginal costs proximately caused by Dr. Shehata's negligence.

{¶27} Guiliani argues this court should review the trial court's failure to admit the medical bills under a de novo standard of review because the trial court's decision to deny him the opportunity to admit the bills was based upon its analysis of his burden of proof. We disagree. The trial court's decision regarding the admissibility of the medical bills is reviewed under an abuse-of-discretion standard. *See Fiorini v. Whiston*, 92 Ohio App.3d 419, 426, 635 N.E.2d 1311 (1st Dist.1993); *Garcea v. Woodhull,* 9th Dist. Wayne No. 01CA0069, 2002-Ohio-2437, ¶ 8.

{¶28} Based upon our review of the record, we cannot say the trial court abused its discretion in denying the admission of these medical bills. In this complex medical case, Guiliani needed an expert to make the causal connection between Dr. Shehata's negligence and Guiliani's treatment at M.D. Anderson. The evidence showed he required a major operation regardless of whether Dr. Shehata was negligent. Under these circumstances, Guiliani could not claim all the costs from the September 2010 surgery when he would also have had significant costs if the cancer had been discovered in September 2009. As a result, we overrule Guiliani's second assignment of error.

### Guiliani's Comparative Negligence

{¶29} In his first cross-assignment of error, Dr. Shehata argues that "the trial court erred in entering judgment for Guiliani that was not properly reduced to account for his thirty percent comparative negligence."

{¶30} Dr. Shehata argues that the trial court erred in applying R.C. 2315.35 before it applied the damage limitation in R.C. 2323.43. R.C. 2315.35 provides that

> [a]fter the court makes its findings of fact or after the jury returns
>
> its general verdict accompanied by answers to interrogatories * * *
>
> the court shall diminish the *total amount of the compensatory*
>
> *damages that would have been recoverable* by an amount that is

11

proportionally equal to the percentage of tortious conduct determined under section 2307.23 of the Revised Code that is attributable to the plaintiff. If the percentage of the tortious conduct determined to be attributable to the plaintiff is greater than the sum of the percentages of the tortious conduct determined to be attributable to all parties to the tort action from whom the plaintiff seeks recovery plus all persons from whom the plaintiff does not seek recovery in this action, the court shall enter judgment in favor of the defendants.

(Emphasis added.)

{¶31} R.C. 2323.43(D)(1) prohibits the trial court from entering judgment for noneconomic loss in an amount that exceeds the damages caps set forth in the statute. Dr. Shehata argues that the definition of recoverable: "capable of being recovered, esp. as a matter of law," should naturally lead a court to presume that the adjustment for a plaintiff's comparative negligence should be made after the statutory limitation is applied because, as a matter of law, Guiliani cannot recover in excess of $250,000. We disagree.

{¶32} R.C. 2323.43(A)(2) states that "Except as otherwise provided in division (A)(3) of this section, the amount of compensatory damages that represents damages for noneconomic loss that is recoverable in a civil action under this section to recover damages for injury, death, or loss to person or property shall not exceed * * * $250,000." R.C. 2323.43(B) further provides that the jury in a jury trial shall return a general verdict accompanied by answers to interrogatories that specify:

(1) the total compensatory damages recoverable by the plaintiff;

(2) the portion of the total compensatory damages that represent economic loss;

 (3) the portion of the total compensatory damages that represents noneconomic loss;

{¶33} R.C. 2323.43(C)(1) further provides that

after the trier of fact in a civil action upon a medical * * * claim to recover damages * * * complies with (B) the court shall enter a judgment in favor of the plaintiff for compensatory damages for noneconomic loss.  In no event shall a judgment for compensatory damages for noneconomic loss exceed the maximum recoverable amount that represents damages  for noneconomic loss as provided in divisions (A)(2) and (A)(3) of this section.  *Division A of this section shall be applied in a jury trial only after the jury has made its factual findings and determination of damages.*

(Emphasis added.)

{¶34}   The statute further provides that the jury cannot be instructed regarding the existence of the statutory damage caps.  *See* R.C. 2323.43(A)(3) (providing that "[i]f the trier of fact is a jury, the court shall not instruct the jury with respect to the limit on compensatory damages for noneconomic loss described in divisions (A)(2) and (A)(3) and neither counsel for any party nor a witness shall inform the jury or potential jurors of that limit.").  Reading these subsections together supports the interpretation that the jury award represents the uncapped amount of compensatory damages recoverable by the plaintiff.

{¶35}   Moreover, as Guiliani points out, the Tenth Appellate District has reached a similar conclusion in an analogous situation involving statutory caps for punitive

13

damages under R.C. 2315.21. In *Faieta v. World Harvest Church*, 10th Dist. Franklin No. 08AP-527, 2008-Ohio-6959, the Tenth District rejected the same narrow construction of the word "recoverable" that Dr. Shehata advances in this case.

{¶36} In *Faieta*, the jury had awarded compensatory damages of $764,235 and punitive damages of $5 million against the defendant World Harvest Church ("WHC"). *Id.* at ¶ 87. The defendant had argued that the court was required to apply the punitive-damage cap (2x the compensatory-damage limit) to the already-capped compensatory damages under R.C. 2315.21, which limits the noneconomic compensatory damages to $250,000. *Id.* at ¶ 88. Because the statute did not expressly state whether the limitation applied before or after the cap, the court was faced with determining legislative intent. *Id.* at ¶ 89

{¶37} The Tenth Appellate District noted that the defendant's argument focused on the word "recoverable" in R.C. 2315.21(B)(2) and (3), summarizing its analysis as follows:

R.C. 2315.21(D)(2) explicitly provides that the 'compensatory damages awarded to the plaintiff from that defendant, as determined pursuant to [R.C. 2315.21(B)(2) or (3)]' are to be used to calculate the cap on damages. Those statutory provisions refer to the uncapped, total compensatory damages to be awarded to the plaintiff from each defendant. R.C. 2315.21(B)(2) and (B)(3) make no reference to statutory caps on damages awards, and R.C. 2315.18(F)(2) expressly precludes the trial court from informing the jury of the existence of statutory caps. The court applies statutory caps on compensatory damages only after the jury has rendered its verdict and made an award of compensatory damges in the case. *See* R.C. 2315.18(E)(1). Accordingly, we conclude the total

14

compensatory damages referenced in R.C. 2315.21(B)(2) are the uncapped compensatory damages the jury awarded.

*Id.* at ¶ 90.

{**¶38**} Similarly, R.C. 2323.43(A)(3) states

If the trier of fact is a jury, the court shall not instruct the jury with respect to the limit on compensatory damages for noneconomic loss described in divisions (A)(2) and (A)(3) of this section, and neither counsel for any party nor a witness shall inform the jury or potential jurors of that limit.

Because the legislature has explicitly indicated that a jury cannot be instructed regarding the existence of statutory caps on compensatory damages representing noneconomic loss as it applies to medical malpractice, it would be inconsistent with the substance of R.C. 2323.43(B)(3) to define "recoverable" damages as capped damages. Moreover, if the legislature had intended that the comparative-negligence statute apply after the damage-cap statute, it could have explicitly provided for that in the damage-cap statute.

{**¶39**} In addition to the *Faieta* court, courts in California, Maine, and Massachusetts have reached the same conclusion, holding that a jury's determination of comparative negligence should be applied before any statutorily mandated caps on damages are subtracted from the total amount of damages. *See McAdory v. Rogers*, 215 Cal.App.3d 1273, 264 Cal. Rptr. 71 (Cal.Ct.App.1989); *Atkins v. Strayhorn*, 223 Cal.App.3d 1380, 273 Cal.Rptr. 231 (Cal.Ct.App.1990); *Brown v. Crown Equip. Corp.*, 2008 ME 186, 960 A.2d 1188, ¶ 25 (Me.2008); *Rodriguez v. Cambridge Housing Auth.*, 59 Mass.App.Ct. 127, 795 N.E.2d 1 (Mass.App.Ct.2003). Those courts have held that applying comparative negligence before the statutory-damage limit does not frustrate the purpose of comparative-negligence principles. *See Atkins*, *supra*.

{¶40} Given our review of the language of the statute, and the above authority, we hold that the trial court did not err in applying R.C. 2315.35, the comparative-negligence statute, to reduce the jury's verdict from $1,000,000 to $700,000 to account for its finding that Guiliani was 30 percent comparatively negligent, before applying the damage cap of $250,000 in R.C. 2323.43. As a result, we overrule Dr. Shehata's first cross-assignment of error.

### Expert Testimony

{¶41} In his second cross-assignment of error, Dr. Shehata argues the trial court erred in permitting Giuliani to present expert testimony from Dr. Donehower, a board-certified medical oncologist, overruling Dr. Shehata's motions to strike Dr. Donehower's testimony, and overruling Dr. Shehata's motion for a directed verdict. Dr. Shehata specifically argues that Dr. Donehower has no special training or residency in radiation oncology, has no experience in the procedure that caused the generation of the report, and does not work with radiation oncologists until after patients have had surgery.

{¶42} "A trial court has discretion to determine whether a witness is competent to testify as an expert, and the trial court's decision will not be reversed absent an abuse of discretion." *Celmer v. Rodgers*, 114 Ohio St.3d 221, 2007-Ohio-3697, 871 N.E.2d 557, ¶ 19. Evid.R. 702 provides that a witness may testify as an expert if "[t]he witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony."

{¶43} The Ohio Supreme Court has held that in medical-malpractice cases "a witness need not practice in the exact same specialty as that of the defendant-physician; rather, it is the scope of the witness's knowledge and not the artificial classification by title that should govern the threshold question of his qualifications." *Alexander v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d 155, 160, 383 N.E.2d 564 (1978). "When fields of

medicine overlap and more than one type of specialist may perform the treatment, the witness may qualify as an expert even though he does not practice the same specialty." *Id.* at 158. Thus, an expert need only aid the trier of fact in the search for the truth and need not be the best witness on the subject. *Id.* at 159.

{¶44} Dr. Donehower testified that he is a board-certified oncologist, and former member of the board of directors of the American Society of Clinical Oncology. Clinical oncology is a specialty of medicine that encompasses medical oncology, surgical oncology, and radiation oncology. The record reflects that, although the three specialties apply different modalities to treat cancer, the guidelines are the same.

{¶45} Dr. Donehower testified that he has been practicing medicine for 37 years and that throughout his career he has worked closely and intensively with radiation oncologists in his practice. He reviews cases, attends conferences, and routinely discusses cases with them. He is involved in the care of patients who undergo seed-implant procedures by radiation oncologists, and he has worked with radiation oncologists when a patient is receiving seed implants. Based upon this experience, he knows the standard of care for radiation oncologists when they order CT reports for seed-implantation procedures. The standard of care is to review the films and read the report.

{¶46} Based upon our review of the record, we cannot conclude that the trial court abused its discretion in concluding that Dr. Donehower was qualified to render an opinion as to the standard of care for a radiation oncologist. *See Ishler v. Miller*, 56 Ohio St.2d 447, 453, 384 N.E.2d 296 (1978) (doctor specializing in neurology and psychiatry competent to testify as to standard of care of orthopedic surgeon in unnecessary surgery case); *King v. LaKamp*, 50 Ohio App.3d 84, 553 N.E.2d 701 (1st Dist.1988) (orthopaedic surgeon competent to testify to standard of care of a podiatrist);

*Peters v. Lohr*, 1st Dist. Hamilton No. C-060230, 2007-Ohio-7062, ¶ 37 (neurosurgeon competent to testify to standard of care of a vascular surgeon); *Manchise v. Ionna*, 1st Dist. Hamilton No. C-120874, 2013-Ohio-3612, ¶21 (gastroenterologist testifying as to the standard of care of an emergency-room physician); *Schutte v. Mooney*, 165 Ohio App.3d 56, 2006-Ohio-44, 844 N.E.2d 899, ¶ 29-35 (2d Dist.) (vascular surgeon testifying as to the standard of care of emergency-room physician).

{¶47} Although this court might reach a different result with respect to Dr. Donehower's qualifications as an expert in this case, the admission of his testimony was not an abuse of discretion. *See Culp v. Olukoga*, 2013-Ohio-5211, 3 N.E.3d 724, ¶ 59 (4th Dist.2013) ("an abuse of discretion will not be found simply because a reviewing court could reach a different opinion were it deciding the issue de novo."). We, therefore, overrule Dr. Shehata's second cross-assignment of error, and affirm the judgment of the trial court.

Judgment affirmed.

**DINKELACKER, P.J.,** and **DEWINE, J.,** concur.

Please note:

The court has recorded its own entry this date.