[Cite as *Coykendall v. Lima Refining Co.*, 2024-Ohio-2835.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

James D. Coykendall, et al.                    Court of Appeals No.  L-23-1100

    Appellees                                  Trial Court No.  CI0202203766

v.

Lima Refining Company                          **DECISION AND JUDGMENT**

    Appellant                                  Decided:  July 26, 2024

* * * * *

Marc G. Williams-Young, for appellees.

Mark D. Wagoner and Larry J. Obhof, Jr., for appellant.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant Lima Refining Company ("Lima Refining") appeals the judgments of the Lucas County Court of Common Pleas, following a jury trial, which awarded appellees James and Shelley Coykendall $1,159,705 in economic damages and $500,000 in noneconomic damages on their claims for negligence and loss of consortium.

For the following reasons, the judgments of the Lucas County Court of Common Pleas are affirmed.

## I. Background Facts and Procedural History

{¶ 2} Lima Refining operates a petroleum refinery in Lima, Ohio, often referred to as the "Husky" refinery. From the refinery, fuels are transported in pipelines throughout North America. Sunoco Logistics Partners GP and Energy Transfer L.P. (collectively "Energy Transfer") are midstream suppliers that operate some of those pipelines, including a pipeline facility immediately adjacent to the Husky refinery. In this case, jet fuel from Lima Refining flowed into Energy Transfer's "line 8" pipeline to downstream customers.

{¶ 3} On January 5, 2018, James Coykendall, who worked as a pipeliner for Energy Transfer, received a call to perform repair work on a "BC Header line 8 valve" located on Energy Transfer's property.

{¶ 4} Prior to commencing work, Coykendall and the others with him attempted to close the first upstream valve, a 16-inch WKM valve owned by Energy Transfer and located on its property. The WKM valve was partially buried, which prevented Energy Transfer workers from bleeding the valve to confirm that it was working and closed. The workers utilized a vacuum truck to remove any remaining product or pressure in the line between the WKM valve and the header valve that needed repaired.

2.

{¶ 5} In addition to closing the WKM valve, Energy Transfer Station Operator Nicholas Drummelsmith telephoned Lima Refining Head Pumper Robert Myers to inform him that there was trouble on line 8 and to request that the line be shut down. In response, Lima Refining shut off the pump to line 8 as was its custom.

{¶ 6} Coykendall then began working on the header valve. During the repair, internal processes at Lima Refining caused jet fuel to be sent down line 8 even though the line 8 pump was off. When the jet fuel came down the pipeline, the WKM valve failed and thousands of gallons of jet fuel spilled out onto Coykendall. It was not until another Energy Transfer worker closed Lima Refining's "fence line" valve further upstream that the flow of jet fuel stopped.

{¶ 7} Following the accident, Coykendall continued to work, but was later taken for a mandatory drug test pursuant to company policy, and then was driven home. He did not remove his jet-fuel-soaked clothes and take a shower until six or seven hours after the accident.

{¶ 8} In the days following the accident, Coykendall's behavior changed. While he was once considered very outgoing and the "life of the party," Coykendall became withdrawn. His voice became a quiet whisper, he had difficulty forming sentences and completing thoughts, and he experienced trouble maintaining his balance. Friends and family that knew him well testified that he was a completely different person.

3.

{¶ 9} On September 19, 2022, the Coykendalls filed a complaint against Lima Refining, seeking damages for negligence and loss of consortium.[1] The matter proceeded to an eight-day jury trial beginning on December 12, 2022. Following the trial, the jury rendered a verdict in favor of the Coykendalls in the amount of $5,371,320, which consisted of an award to James Coykendall of $3,313,443 for past and future economic loss and $1,605,377 for past and future noneconomic loss, and an award to Shelly Coykendall of $452,500 for past and future damages on her loss of consortium claim. In addition, the jury made specific findings that 15 percent of the negligence that was a direct and proximate cause of the injuries was attributable to James Coykendall, 35 percent was attributable to Lima Refining, and 50 percent was attributable to non-party Energy Transfer.

{¶ 10} On January 12, 2023, upon motion of the parties, the trial court applied the percentage of negligence attributable to Lima Refining as well as statutory caps on noneconomic damages to reduce the jury award to $1,159,707 to James Coykendall for past and future economic damages and a total of $500,000 to James and Shelly Coykendall for past and future noneconomic damages.

{¶ 11} Lima Refining then filed motions for judgment notwithstanding the verdict and alternatively for a new trial or remittitur. The motions argued, in part, that Coykendall failed to produce sufficient evidence that Lima Refining owed him a duty,

---

[1] The present action, case No. CI2022-3766, was filed after the original action in case No. CI2019-4767 was voluntarily dismissed on September 15, 2022.

that it breached the duty, and that the breach proximately caused his damages. Lima Refining also maintained that the trial court's reduction of the award for noneconomic damages was incorrect because R.C. 2315.18 required the trial court to apply the statutory cap of $500,000 first and then apply the reduction for percentage of comparative fault, which would have resulted in a noneconomic damages award of $175,000.

{¶ 12} In two separate orders, the trial court denied Lima Refining's motions for judgment notwithstanding the verdict and for a new trial.

## II. Assignments of Error

{¶ 13} Lima Refining timely appealed the trial court's judgments, asserting three assignments of error for review:

1. The trial court erred in its "duty" instruction to the jury. The court erroneously applied a duty assumed by contract test to Defendant-Appellant.

2. Plaintiffs failed to prove causation as a matter of law.

3. The trial court erred in its application of R.C. 2315.18(B)(2)'s statutory cap on compensatory damages for non-economic loss. The court should have applied the statutory cap prior to applying the apportionment of comparative fault.

### III. Analysis

### A. "Duty" Instruction

{¶ 14} In its first assignment of error, Lima Refining argues that the trial court erred when it instructed the jury on the issue of duty.

{¶ 15} "A trial court is obligated to provide jury instructions that correctly and completely state the law." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 2015-Ohio-229, ¶ 22; *State v. Nye*, 2021-Ohio-2557, ¶ 14 (6th Dist.). "The jury instructions must also be warranted by the evidence presented in a case." *Id.*; *see also State v. Knuff*, 2024-Ohio-902, ¶ 182 ("[R]equested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction."). "The question of whether a jury instruction is legally correct and factually warranted is subject to de novo review." *Id.*

{¶ 16} Here, the trial court provided the following instruction to the jury:

> Where a party is negligent in performing a duty that it has assumed by oral agreement or written contract and that negligence is a proximate cause of another party's injuries, the negligent party is liable to the injured party for those injuries.

{¶ 17} On appeal, Lima Refining does not argue that the jury instruction is an incorrect statement of law. Indeed, "[t]here [arises] a duty recognized in every contract

that each party will fulfill [its] obligations with care, skill, and faithfulness." *Thompson v. Germantown Cemetery*, 2010-Ohio-1920, ¶ 10 (2d Dist.), quoting *Wagenheim v. Alexander Grant & Co.*, 19 Ohio App.3d 7, 14 (10th Dist. 1983). "While a breach of contract is ordinarily not a tort, a party that fails to exercise due care when performing his obligations under a contract gives rise to a cause of action in tort." *Id.*, citing *Hubbell v. Xenia*, 2008-Ohio-490, ¶ 25 (2d Dist.); *Durham v. Warner Elevator Mfg. Co.*, 166 Ohio St. 31 (1956) (sufficient evidence existed to find that elevator inspector was negligent in its assumed contractual duty to service and examine the elevator).

{¶ 18} Instead, it argues that the instruction was not warranted by the facts of the case because there was no contract or agreement that required it to close either the "fence line" valve or any other valves. In making this argument, Lima Refining cites *Rich v. Ohio Underground*, 1991 WL 270659 (2d Dist. Dec. 16, 1991), which was relied on heavily throughout the proceedings, and which supplied the language used in the trial court's jury instruction on duty. In *Rich*, a pipefitter was injured when the company for which he was repairing a pipe failed to purge the line of ammonia despite promising that it would do so and indicating that it had. *Id.* at *2.

{¶ 19} Lima Refining contends that the facts in the present case are dissimilar from *Rich* because here there was no "clear, unambiguous binding oral contract" between the defendant and the employer of the injured party. It asserts "in this case there was no oral (or written) contract regarding any of the alleged acts or omissions leading up to the

7.

release of the jet fuel onto Coykendall." Specifically, it states that the only agreement on January 5, 2018, was for Lima Refining to shut down the Line 8 pump, which it unquestionably did; it was not requested to, and did not agree to, close any valve, including the fence line valve. Further, Lima Refining points to testimony that it was customary for it to only shut down the line pump and that the employees from Energy Transfer would not have asked it to close any of its valves. Finally, it argues that no consideration was given to support a contractual duty for Lima Refining to close the fence line valve or any other valve.

{¶ 20} While Lima Refining emphasizes the evidence showing that it only had a duty to shut down the Line 8 pump, other evidence in the record highlighted by Coykendall suggests a broader duty to prevent fuel from coming down the line. For example, Dean Hempfling, the operations director for Lima Refining, testified that Lima Refining relies on the people that run the pipelines to dictate when to start and stop the flow of the jet fuel. He agreed that "Energy Transfer would be able to rely on . . . Lima Refining not to send fuel down the line if indeed it was requested not to do so" and that "it was the responsibility of Lima Refining to stop [when it was told to stop]." Similarly, Robert Myers, who was a head pumper for Lima Refining, testified that the recipients of the fuel—in this case Energy Transfer—are "the ones in charge or in control" of when the fuel is sent and he would expect Energy Transfer to rely upon him to shut down the

8.

pipeline if that was requested. Myers acknowledged that it would not be safe to send fuel down the line before Energy Transfer was ready to receive it.

{¶ 21} The scope of the duty that Lima Refining owed to Coykendall was a critical issue in this case. To that end, Lima Refining argues that it had a narrow, contractually-agreed-upon duty only to shut down the Line 8 pump. Coykendall, on the other hand, argues that Lima Refining had a broader contractual duty not to send fuel down the line without permission. Whether an agreement existed and whether that agreement imposed a broadly or narrowly defined duty was left to the province of the jury. *See LaPoint v. Templeton*, 2008-Ohio-1792, ¶ 35 (6th Dist.) ("The fact of the existence of a contract and the terms of an oral contract are ordinarily for the determination of the jury in light of the evidence offered, to be determined from all the facts, words, acts, conduct, and circumstances surrounding the parties at the time."). That issue, however, is separate from whether the jury instruction on "duty" was appropriate.

{¶ 22} The jury instruction on "duty" given by the trial court was warranted if the evidence showed that Lima Refining assumed a duty by oral agreement or written contract and negligently performed that duty. Under either party's view, evidence existed that there was an agreement that imposed a duty on Lima Refining and raised the question of whether Lima Refining performed that duty negligently. Because the instruction on "duty" was legally correct and applicable to the facts in this case, the trial court did not err when it provided the instruction to the jury.

9.

**{¶ 23}** Accordingly, Lima Refining's first assignment of error is not well-taken.

### B. Causation

**{¶ 24}** In its second assignment of error, Lima Refining argues that the trial court erred in denying its motion for judgment notwithstanding the verdict because Coykendall's witnesses were not qualified to give opinions about causation as a matter of law. The denial of a motion for judgment notwithstanding the verdict "raises a question of law requiring de novo review as to whether the evidence, construed most strongly in favor of appellees, is legally sufficient to sustain the jury's verdict." *Link v. FirstEnergy Corp.*, 2016-Ohio-5083, ¶ 22, citing *Environmental Network Corp. v. Goodman Weiss Miller, L.L.P.*, 2008-Ohio-3833, ¶ 23.

**{¶ 25}** "To present a prima facie case involving an injury caused by exposure to mold or other toxic substance, a claimant must establish (1) that the toxin is capable of causing the medical condition or ailment (general causation) and (2) that the toxic substance in fact caused the claimant's medical condition (specific causation)." *Terry v. Caputo*, 2007-Ohio-5023, paragraph one of the syllabus. "Establishing general causation and specific causation in cases involving exposure to mold or other toxic substances involves a scientific inquiry, and thus causation must be established by the testimony of a medical expert." *Id.* at paragraph two of the syllabus. "Without expert testimony to establish both general causation and specific causation, a claimant cannot establish a

prima facie case of exposure to mold or other toxic substances." *Id.* at paragraph three of the syllabus.

{¶ 26} At the outset, Lima Refining argues that Coykendall's treating physicians, Dr. Fox, Dr. Noftz, and Dr. Patti, were not qualified to give expert opinions about causation because they had no experience dealing with jet fuel exposure prior to treating him. Further, their opinions failed to undertake the scientific inquiry necessary to determine the actual cause of Coykendall's conditions. Citing *Valentine v. PPG Industries, Inc.*, 2004-Ohio-4521, ¶ 47 (4th Dist.), Lima Refining argues that the experts' heavy reliance on the timing of the exposure relative to the onset of the symptoms was insufficient because "mere coincidence of exposure and the appearance of a disease is never sufficient to prove causation in an individual instance." Additionally, it contends that the trial court's reliance on Dr. Fox and Dr. Noftz's employment of "differential diagnosis"—which is a process of determining the cause of symptoms by eliminating other potential causes— was error because, as recognized by *Valentine v. Conrad*, 2006-Ohio-3561, ¶ 22, differential diagnosis "is appropriate only when considering potential causes that are scientifically known." Lima Refining asserts that the potential causes are not scientifically known because there are no studies in the medical literature showing that acute exposure to jet fuel could cause Coykendall's symptoms. Thus, because the experts were not qualified, Lima Refining argues that Coykendall failed to prove causation and his negligence claim must fail as a matter of law.

11.

{¶ 27} Both of Lima Refining's arguments—that the experts had no experience with jet fuel exposure and that they relied on differential diagnosis and the temporal relationship—attack the reliability and qualifications of Dr. Fox, Dr. Noftz, and Dr. Patti to testify as expert witnesses. Whether the doctors were qualified to testify as experts, however, is a question of admissibility. Indeed, each case cited by Lima Refining analyzing this issue does so in the context of whether the experts' testimony was admissible under Evid.R. 702. *See Caputo* at ¶ 16-30; *Valentine v. PPG Industries* at ¶ 22-57; *Valentine v. Conrad* at ¶ 9-23; *Kerns v. Hobart Bros. Co.*, 2008-Ohio-2242, ¶ 10-112 (2d Dist.). It is only after the expert testimony was excluded that the courts held that the plaintiffs failed to prove causation as a matter of law. *See Caputo* at ¶ 31; *Valentine v. PPG Industries* at ¶ 57-58; *Kerns* at ¶ 125. But, in this case the expert opinions and testimony of Dr. Fox, Dr. Noftz, and Dr. Patti were admitted into evidence and Lima refining does not present as an assignment of error, nor does it argue, that the trial court erred in permitting the doctors to testify as expert witnesses under Evid.R. 702.[2] Thus, the jury could properly consider the experts' testimony on the issues of general and specific causation.

---

[2] Prior to the case being dismissed and refiled, the trial court held a *Daubert* hearing regarding Dr. Fox and Dr. Noftz, and on August 26, 2022, found that they were qualified to testify as experts on the subject of causation.

**{¶ 28}** Even considering the experts' testimony, Lima refining argues that the evidence was insufficient because of the lack of medical literature or studies. This court has recognized, however, that

> only rarely are humans exposed to chemicals in a manner that permits a quantitative determination of adverse outcomes . . . Consequently, while precise information concerning the exposure necessary to cause specific harm to humans and exact detail pertaining to the plaintiff's exposure are beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not invariably provide the basis for an expert's opinion on causation.

*Cutlip v. Norfolk Southern Corp.*, 2003-Ohio-1862, ¶ 52 (6th Dist.), quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 264 (4th Cir. 1999). In this case, it is unsurprising that there is no medical literature documenting the effects of being doused with thousands of gallons of jet fuel. But that does not mean that the record is without evidence of the potential effects of jet fuel exposure. To the contrary, the Material Safety Data Sheet produced by Lima Refining documents the effects of short and long-term chronic exposure to jet fuel:

> . . . Chronic inhalation exposure to xylene causes mid-frequency hearing loss in laboratory animals. Xylene reacts synergistically with n-hexane to

13.

enhance hearing loss. Immunodepressive effects have also been reported for Benzene. Hydrogen sulphide may reduce lung function; cause neurological effects such as headaches, nausea, depression and personality changes; eye and mucous membrane irritation; and damage to cardiovascular system.

Further, if inhaled, jet fuel may cause "respiratory irritation. Signs/symptoms may include cough, sneezing, nasal discharge, headache, hoarseness, and nose and throat pain. Excessive inhalation may cause headache, dizziness, confusion, loss of appetite and/or loss of consciousness." Notably, Coykendall's symptoms of loss of his voice, dizziness, confusion, and personality change are all listed as possible effects of jet fuel exposure. Thus, the evidence is sufficient to demonstrate that jet fuel exposure is capable of causing Coykendall's symptoms.

{¶ 29} Turning to the issue of specific causation, the evidence includes the experts' testimony to a reasonable degree of medical certainty that the jet fuel exposure actually caused Coykendall's symptoms based upon a consideration of the nature of jet fuel, the temporal proximity between the exposure and the onset of symptoms, and the lack of any other explanatory events. Whether those experts should have been permitted to give those opinions is a separate issue, but clearly the expert testimony of Dr. Fox, Dr. Noftz, and Dr. Patti presented to the jury is legally sufficient to support its verdict.

{¶ 30} Accordingly, Lima Refining's second assignment of error is not well-taken.

14.

## C. Damages

**{¶ 31}** Finally, in its third assignment of error, Lima Refining argues that the trial court erred in its award of compensatory damages for noneconomic loss. Broadly speaking, this issue involves the interplay between the statutes setting a cap on noneconomic damages and those that apportion liability based on comparative fault. Lima Refining argues that the statutory cap should be applied first with the award then reduced to the percentage of comparative fault. In this case, it argues that the jury's noneconomic damages award of $2,057,877 should have been capped at $500,000 of which it would be responsible for 35 percent, or $175,000. In contrast, Coykendall argues, and the trial court found, that the percentage of comparative fault should apply first with that amount then subject to the statutory cap. Thus, Coykendall argues that the $2,057,877 award should have been reduced to $720,257 and then capped at $500,000.

**{¶ 32}** "The interpretation and application of a statute is a question of law subject to de novo review." *Kerger & Hartman, L.L.C. v. Ajami*, 2015-Ohio-5157, ¶ 39 (6th Dist.); *Cleveland Clinic Found. v. Cleveland Bd. of Zoning Appeals*, 2014-Ohio-4809, ¶ 25, quoting *Henley v. Youngstown Bd. of Zoning Appeals*, 90 Ohio St.3d 142, 147 (2000) ("[T]he application of [a statute] to the facts is a 'question of law.'"). "Under such review, an appellate court does not give deference to the trial court's determination." *Id.*

**{¶ 33}** R.C. 2315.18 caps noneconomic damages and provides, in relevant part:

15.

(B)(2) Except as otherwise provided in division (B)(3) of this section, *the amount of compensatory damages that represents damages for noneconomic loss that is recoverable in a tort action under this section to recover damages for injury or loss to person or property shall not exceed* the greater of two hundred fifty thousand dollars or an amount that is equal to three times the economic loss, as determined by the trier of fact, of the plaintiff in that tort action to a maximum of three hundred fifty thousand dollars for each plaintiff in that tort action or a maximum of five hundred thousand dollars for each occurrence that is the basis of that tort action.

. . .

(D) If a trial is conducted in a tort action to recover damages for injury or loss to person or property and a plaintiff prevails in that action, . . . the jury in a jury trial shall return a general verdict accompanied by answers to interrogatories, that shall specify all of the following:

(1) The total compensatory damages recoverable by the plaintiff;

(2) The portion of the total compensatory damages that represents damages for economic loss;

(3) The portion of the total compensatory damages that represents damages for noneconomic loss.

(E)(1) *After the trier of fact in a tort action to recover damages for injury or loss to person or property complies with division (D) of this section . . . the court shall enter a judgment in favor of the plaintiff for compensatory damages for noneconomic loss*. Except as provided in division (B)(3) of this section, in no event shall a judgment for compensatory damages for noneconomic loss exceed the maximum recoverable amount that represents damages for noneconomic loss as provided in division (B)(2) of this section. Division (B) of this section shall be applied in a jury trial only after the jury has made its factual findings and determination as to the damages.

. . .

(F)(1) A court of common pleas has no jurisdiction to enter judgment on an award of compensatory damages for noneconomic loss in excess of the limits set forth in this section.

(F)(2) If the trier of fact is a jury, the court shall not instruct the jury with respect to the limit on compensatory damages for noneconomic loss described in division (B)(2) of this section, and neither counsel for any party nor a witness shall inform the jury or potential jurors of that limit.

. . .

(G) With respect to a tort action to which division (B)(2) of this section applies, any excess amount of compensatory damages for noneconomic loss that is greater than the applicable amount specified in division (B)(2) of this section shall not be reallocated to any other tortfeasor beyond the amount of compensatory damages that the tortfeasor would otherwise be responsible for under the laws of this state.

{¶ 34} Also relevant here are the statutes pertaining to comparative fault between multiple defendants as well as the plaintiff, which include, inter alia, R.C. 2307.22, 2307.23, 2315.33, 2315.34, 2315.35, and 2315.36. The general framework of those statutes is that the jury should calculate the total amount of compensatory damages recoverable by the plaintiff and specify what portion of those damages constitutes economic loss and what portion constitutes noneconomic loss. The jury should also determine the percentage of tortious conduct that caused the injury and that is attributable to the plaintiff, the defendant(s), and any non-parties, with the combined percentage of tortious conduct totaling 100 percent. As to noneconomic damages, once the jury has made those determinations, the trial court should calculate the proportionate share of a defendant by "multiplying the *total amount of the noneconomic damages awarded to the plaintiff* by the percentage of tortious conduct as determined pursuant to section 2307.23 of the Revised Code that is attributable to that defendant." (Emphasis added.) R.C. 2307.22(C).

18.

{¶ 35} While it appears that no case law is directly on point, Coykendall relies on *Guiliani v. Shehata*, 2014-Ohio-4240 (1st Dist.), in which the First District addressed a related situation. *Guiliani* involved the application of a statutory cap under R.C. 2323.43 for noneconomic damages for a medical claim. R.C. 2323.43 and 2315.18 use nearly identical language in imposing the cap. *Compare* R.C. 2323.43(A)(2) ("[T]he amount of compensatory damages that represents damages for noneconomic loss that is recoverable in a civil action under this section to recover damages for injury, death, or loss to person or property shall not exceed. . .") *with* R.C. 2315.18(B)(2) ("[T]he amount of compensatory damages that represents damages for noneconomic loss that is recoverable in a tort action under this section to recover damages for injury or loss to person or property shall not exceed. . .").

{¶ 36} In that case, the plaintiff in a medical malpractice action was awarded $1,000,000 in damages for noneconomic loss. The defendant doctor was 70 percent negligent and the plaintiff was 30 percent negligent. *Id.* at ¶ 14. The trial court first reduced the jury award to $700,000, and then applied the statutory cap of $250,000 pursuant to R.C. 2323.43. *Id.* On appeal, the doctor argued that the trial court should have applied the cap first and then attributed a proportion of damages under R.C. 2315.35, which provides "the court shall diminish the *total amount of the compensatory damages that would have been recoverable* by an amount that is proportionally equal to the percentage of tortious conduct determined under section 2307.23 of the Revised Code

19.

that is attributable to the plaintiff." (Emphasis added.) The doctor contended that the phrase "would have been recoverable" meant the damages after application of the statutory cap because, as a matter of law, the plaintiff could not recover in excess of the statutorily capped amount of $250,000. *Id.* at ¶ 31.

{¶ 37} In rejecting this argument, the First District reasoned that R.C. 2323.43(B) instructs the jury to determine "the total compensatory damages recoverable by the plaintiff," and "the portion of the total compensatory damages that represents damages for noneconomic loss." Further R.C. 2323.43(C)(1) provided that "Division A of this section shall be applied in a jury trial only after the jury has made its factual findings and determination as to the damages." Finally, R.C. 2323.43(D)(2) provided that the court cannot instruct the jury on the statutory cap. Reading those sections together, the First District concluded that "the jury award represents the uncapped amount of compensatory damages recoverable by the plaintiff." *Guiliani* at ¶ 34. "Because the legislature has explicitly indicated that a jury cannot be instructed regarding the existence of statutory caps on compensatory damages representing noneconomic loss as it applies to medical malpractice, it would be inconsistent with the substance of R.C. 2323.43(B)(3) to define 'recoverable' damages as capped damages." *Id.* at ¶ 38. "Moreover, if the legislature had intended that the comparative-negligence statute apply after the damage-cap statute, it could have explicitly provided for that in the damage-cap statute." *Id.* Therefore, the

First District affirmed the trial court's judgment that applied the comparative fault statute first before applying the statutory cap. *Id.* at ¶ 40.

{¶ 38} *Guiliani* focused on the meaning of "would have been recoverable" in R.C. 2315.35 pertaining to the comparative fault of the plaintiff. The same provision is relevant in the present case. Thus, to determine the appropriate amount of damages, "the court shall diminish the *total amount of the compensatory damages that would have been recoverable* by an amount that is proportionally equal to the percentage of tortious conduct determined under section 2307.23 of the Revised Code that is attributable to the plaintiff." (Emphasis added.) R.C. 2315.35. Following *Guiliani*, the "amount of the compensatory damages that would have been recoverable" is the total amount determined by the jury before any statutory caps are applied.

{¶ 39} This case is unique, however, because it also involves the comparative fault of another, non-defendant, tortfeasor. To that end, R.C. 2307.22(C) provides that "each defendant who is determined by the trier of fact to be legally responsible for the same injury or loss to person or property or for the same wrongful death shall be liable to the plaintiff only for that defendant's proportionate share of the compensatory damages that represent noneconomic loss." "The proportionate share of a defendant shall be calculated by multiplying the *total amount of the noneconomic damages awarded to the plaintiff* by the percentage of tortious conduct as determined pursuant to section 2307.23 of the Revised Code that is attributable to that defendant." (Emphasis added.) *Id.* Notably,

21.

R.C. 2307.23(A)(1) and (2) respectively instruct the jury to also consider the percentage of tortious conduct "that is attributable to the plaintiff" and "that is attributable to each person from whom the plaintiff does not seek recovery in this action" when it is calculating the 100 percent total of tortious conduct. That is why Lima Refining is only liable for 35 percent of the total noneconomic damages "awarded to the plaintiff." *See* R.C. 2307.23(C) ("For purposes of division (A)(2) of this section, it is an affirmative defense for each party to the tort action from whom the plaintiff seeks recovery in this action that a specific percentage of the tortious conduct that proximately caused the injury or loss to person or property or the wrongful death is attributable to one or more persons from whom the plaintiff does not seek recovery in this action."). The relevant question, then, is whether noneconomic damages "awarded to the plaintiff" as used in R.C. 2307.22(C) means capped or uncapped damages.

{¶ 40} In *Faieta v. World Harvest Church*, 2008-Ohio-6959 (10th Dist.), the Tenth District examined R.C. 2315.21(D)(2)(a) which capped the amount of punitive damages at "two times the amount of the compensatory damages *awarded to the plaintiff from that defendant*, as determined pursuant to division (B)(2) or (3) of this section." (Emphasis added.) R.C. 2315.21(B)(2) instructed the jury, and (B)(3) instructed the court, to specify the total compensatory damages recoverable by the plaintiff from the defendant. In that case, the jury awarded the plaintiffs $764,235 in compensatory damages against World Harvest Church ("WHC"), which included $600,000 in

noneconomic damages. *Faieta* at ¶ 87-88. The jury also awarded the plaintiffs

$5,000,000 in punitive damages against WHC, which the trial court reduced to two times

the amount of compensatory damages for a total of $1,528,470. *Id.* at ¶ 3, 87. Finally,

the trial court applied the statutory cap on noneconomic damages of $250,000 to reduce

the compensatory damages award by $350,000. *Id.* at ¶ 4, 88.

{¶ 41} On appeal, WHC argued that "the trial court should have limited the

punitive damages to two times the amount of the 'capped' compensatory damages

plaintiffs could receive after the court applied R.C. 2315.18(B)(2), which limits the

recovery of noneconomic damages in certain tort actions." *Id.* at ¶ 88. It argued that

"recoverable" as used in R.C. 2315.21(B)(2) and (3) meant those damages that were

legally recoverable, i.e., the amount of noneconomic damages after the cap. The Tenth

District disagreed. It noted that the calculation for the cap in section (D)(2)(a)

specifically referred to the uncapped, total compensatory damages the jury awarded in

section (B)(2) or (3). *Id.* at ¶ 90. The court further noted that (B)(2) and (3) made no

reference to statutory caps on damage awards. In addition, the court reasoned that R.C.

2315.18(F)(2) "expressly precludes the trial court from informing the jury of the

existence of statutory caps" and R.C. 2315.18(E)(1) directs the court to apply the

statutory caps "only after the jury has rendered its verdict and made an award of

compensatory damages in the case." *Id.* Thus, it concluded that "the total compensatory

damages referenced in R.C. 2315.21(B)(2) are the uncapped compensatory damages the jury awarded." *Id.*

{¶ 42} The same reasoning in *Faieta* applies here. R.C. 2307.22(C) refers to the "total amount of the noneconomic damages awarded to the plaintiff;" it makes no reference to statutory caps on damage awards. When considered in conjunction with R.C. 2315.18(F)(2)'s prohibition on informing the jury regarding the statutory caps and R.C. 2315.18(E)(1)'s mandate that the caps "shall be applied in a jury trial only after the jury has made its factual findings and determination as to the damages," the only reasonable conclusion is that R.C. 2307.22(C) applies to the total, uncapped noneconomic damages.

{¶ 43} Therefore, whether in determining the amount of damages in light of the comparative fault of the plaintiff, other defendants, or other non-defendants, the damage calculation must take into consideration the total jury award before the application of any statutory caps. Stated another way, the apportionment of damages must occur first, followed by application of the statutory cap.

{¶ 44} In arguing against this result, Lima Refining asserts that applying apportionment of damages prior to the statutory cap would be inconsistent with R.C. 2315.18 and the legislative purpose behind it. It points to R.C. 2315.18(G), which prohibits reallocating any excess amount for non-economic loss above the statutory cap to any other tortfeasor "beyond the amount of compensatory damages that the tortfeasor

would otherwise be responsible for under the laws of this state" and applies that principle to a hypothetical where two defendants are each found 50 percent liable for noneconomic damages totaling $1,000,000.00. Lima Refining argues that apportioning the damages first and then capping them would result in both defendants being liable to pay $500,000.00, which would exceed the statutory cap in contravention of R.C. 2315.18(B)(2) and (G). Instead, Lima refining suggests that the $1,000,000.00 damage award must first be capped at $500,000.00 with that amount then apportioned between the defendants so that each is liable for $250,000.00.

{¶ 45} As pointed out by Coykendall, Lima Refining's hypothetical is not instructive because in this case there is only one defendant, not two or more. Lima Refining responds that the number of defendants present in the case should not matter and the order should be applied consistently in all cases. While it is correct to apply the order consistently in all cases, the number of tortfeasors present as defendants does have an impact since R.C. 2315.18(B)(2) caps "the amount of compensatory damages that represents damages for noneconomic loss *that is recoverable in a tort action* under this section." (Emphasis added.) Clearly, the percentage of damages attributable to a *non-defendant* tortfeasor is not recoverable in a tort action. In the same way, the percentage of damages attributable to the plaintiff is not recoverable by himself in a tort action that he brings.

25.

{¶ 46} Moreover, Lima Refining's assertion in its hypothetical that if the apportionment of liability is applied before the statutory cap then both defendants would be required to pay $500,000 assumes that the trial court would ignore the statutory cap, which it cannot do. R.C. 2315.18(E)(1) states that "in no event shall a judgment for compensatory damages for noneconomic loss exceed the maximum recoverable amount that represents damages for noneconomic loss as provided in division (B)(2) of this section." Likewise, R.C. 2315.18(F)(1) provides that "[a] court of common pleas has no jurisdiction to enter judgment on an award of compensatory damages for noneconomic loss in excess of the limits set forth in this section." Thus, in Lima Refining's hypothetical, the court could not enter an award for noneconomic damages that exceeded $500,000 in total.

{¶ 47} Admittedly, how a capped amount of noneconomic damages would be divided between two or more defendants is not expressly described in R.C. 2315.18. Nevertheless, that issue is not before this court. Here, there is only one defendant. The jury determined that the Coykendalls had been injured in the amount of $2,057,877 in noneconomic damages. Lima Refining's share of liability for that amount is $720,257. That amount was capped at $500,000. Nothing in this process violates any of the provisions of R.C. 2315.18, 2307.22, or 2315.35.

26.

{¶ 48} The trial court, therefore, did not err when it applied the comparative fault statutes before applying the statutory cap on noneconomic damages, resulting in an order for Lima Refining to pay $500,000 in noneconomic damages to the Coykendalls.

{¶ 49} Accordingly, Lima Refining's third assignment of error is not well-taken.

## IV. Conclusion

{¶ 50} For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas is affirmed. Lima Refining is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                     _____
JUDGE

Christine E. Mayle, J.     

Charles E. Sulek, P.J.             _____
CONCUR.                                    JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.