[Cite as *Porach v. Cleveland Clinic Found.*, 2025-Ohio-2522.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

SUSAN PORACH, INDIVIDUALLY
AND AS ADMINISTRATOR FOR THE :
ESTATE OF ANDREW MICHAEL
PORACH, :

      Plaintiff-Appellant, :

      v. :

THE CLEVELAND CLINIC :
FOUNDATION, ET AL.,
       :

      Defendants-Appellees.

No. 114364

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
          AND REMANDED
**RELEASED AND JOURNALIZED:** July 17, 2025

---

Civil Appeal from the Cuyahoga County Common Pleas Court
Case No. CR-21-951859

---

### *Appearances:*

Elk & Elk Co., Ltd., James M. Kelley, III, Marilena
DiSilvio, and Ian Fijalkovich, *for appellant*.

Bonezzi Switzer Polito & Hupp Co., LPA, Bret C. Perry,
and Christopher F. Mars, *for appellee*.

ANITA LASTER MAYS, J.:

{¶1} Plaintiff-appellant Susan Porach ("Susan"), individually and as administrator for the estate of her son Andrew Michael Porach ("Andrew"), appeals the trial court's granting defendant-appellee Dr. Saman Ghaffari's ("Dr. Ghaffari") motion for a partial directed verdict and asks this court to reverse the trial court's decision and remand to the trial court for a new trial.

{¶2} We affirm the trial court's decision to give a curative instruction rather than excluding the expert-witness testimony. We reverse the trial court's decision granting Dr. Ghaffari's motion for a partial directed verdict. We reverse the trial court's decision preventing Susan and Susan's witnesses from discussing relevant breaches of the standard of care. We affirm the trial court's decision by denying Susan's request to remove a juror for cause. We disregard Dr. Ghaffari's cross-assignment of error arguing that the trial court abused its discretion denying appellee's motion in limine to exclude appellants' expert witness. *See Glidden Co. v. Lumbermens Mut. Cas. Co.*, 2006-Ohio-6553, ¶ 32, quoting *Parton v. Weilnau*, 169 Ohio St. 145, 170-171 (1959) ("'[A]n assignment of error by an appellee, where such appellee has not filed any notice of appeal from the judgment of the lower court, may be used by the appellee as a shield to protect the judgment of the lower court but may not be used by the appellee as a sword to destroy or modify that judgment.'"). We remand to the trial court for a new trial.

## I. Procedural History

{¶3} On August 19, 2021, Susan filed a wrongful death complaint against the Cleveland Clinic Foundation, Cleveland Clinic Avon Rehabilitation Hospital ("the Rehabilitation Hospital"), Dr. Ghaffari, Dr. Ahmad Sabbagh ("Dr. Sabbagh"), Dr. Wassim El-Hitti ("Dr. El-Hitti"), and Nurse Sherri Whitaker ("Nurse Whitaker") alleging that they were negligent in failing to properly and promptly test, monitor, diagnose, and treat her son Andrew while he was under their care. Susan alleged that the care and treatment provided to Andrew fell below acceptable standards of medical care and treatment that resulted in Andrew experiencing great pain, suffering, and eventually death.

{¶4} The defendants filed their answers. Later, Susan dismissed her complaints against Dr. Sabbagh, the Cleveland Clinic Foundation, Nurse Whitaker, and Dr. El-Hitti. Susan and the Rehabilitation Hospital reached a settlement. Susan then proceeded to trial against Dr. Ghaffari. Prior to trial, Dr. Ghaffari filed a motion for separation of witnesses that the trial court granted.

{¶5} On August 12, 2024, trial commenced against Dr. Ghaffari. During voir dire, there were three prospective jurors that Susan wanted excused for cause. They were prospective juror Nos. 7, 17, and 22. The trial court excused prospective juror No. 17 for cause and juror No. 22 because the panel and alternates were chosen but denied Susan's motion to strike prospective juror No. 7 for cause. On

August 15, 2024, Susan rested her case and Dr. Ghaffari moved for a partial directed verdict regarding any standard-of-care violations that did not have the required causal link. The trial court granted the motion for a directed verdict, ruling that Susan could not refer to various breaches of the standard of care. Susan objected. On August 19, 2024, the jury found in favor of Dr. Ghaffari. Thereafter, Susan filed this appeal.

## II.    Facts

**{¶6}** On August 19, 2020, Andrew was admitted to the Rehabilitation Hospital for treatment for chronic inflammatory demyelinating polyneuropathy. Dr. Ghaffari was assigned to Andrew as his attending physician. According to Andrew's preadmission screening, he was designated to stay in the hospital for 15 to 21 days and then follow up with his doctors. On August 21, 2020, according to Nurse Shawna Sultzer ("Nurse Sultzer"), the floor nurse at the hospital, Susan left Andrew's room and reported to her that Andrew was experiencing some changes. When Nurse Sultzer arrived at Andrew's room, she observed him thrashing around with his arms, stating, "I want to get out of here."

**{¶7}** Nurse Sultzer called Dr. Ghaffari on his office phone and explained the situation. Dr. Ghaffari came to Andrew's room and assessed the situation. Dr. Ghaffari then gave Nurse Sultzer an order to administer morphine to Andrew, explaining that it was for neuropathic pain. Prior to this order, Nurse Sultzer never

heard Andrew complain about being in pain nor did Susan tell Nurse Sultzer that Andrew was in pain. Andrew fell asleep soon after the morphine was administered.

{¶8} After Dr. Ghaffari left, Susan indicated to Nurse Sultzer that she wanted to transfer Andrew to another hospital because she was anxious and nervous about Dr. Ghaffari's care of Andrew. Nurse Sultzer told Susan that they could transfer Andrew, but would need to call Dr. Ghaffari to order the transfer. Nurse Sultzer called Dr. Ghaffari on his cell phone, because he had left for the day, and told him that Susan wanted to have Andrew transferred to another hospital. Nurse Sultzer gave the phone to Susan so she could speak to Dr. Ghaffari. While they were on the phone, Nurse Sultzer heard Andrew gasp for air. She called for help and then went to assess him, finding that he did not have a pulse. Nurse Sultzer called a Code Blue and contacted EMS who transported Andrew to the emergency room at the Cleveland Clinic, Avon Hospital, where Andrew was pronounced dead.

{¶9} After an autopsy was performed, Andrew's cause of death was found to be due to an acute coronary event, myocardial infarction, pneumonia, and left ventricular hypertrophy.

{¶10} Susan filed a wrongful death complaint, alleging that Dr. Ghaffari was negligent in treating Andrew and for medical malpractice, and the case proceeded to trial. Before trial, Dr. Ghaffari filed a series of motions including a motion for separation of witnesses, requesting that all witnesses be separated in accordance

with Evid.R. 615(A), including the family of the decedent who would be providing testimony at trial. Dr. Ghaffari further requested an order from the trial court prohibiting any and all witnesses from disclosing the content of their trial testimony. The trial court granted Dr. Ghaffari's motions.

{¶11} Dr. Ghaffari also filed a motion in limine to exclude Susan's expert witness from testifying because he did not practice within the same specialty as Dr. Ghaffari. The trial court denied that motion before the trial.

## A. Voir Dire

{¶12} During voir dire, Susan moved to excuse juror Nos. 7, 17, and 22 for cause. Juror No. 7 stated that she was a registered nurse at the Cleveland Clinic Hospital. Tr. 48. She also stated that her husband works for Cleveland Clinic Hospital at the main campus. *Id.* Juror No. 17 stated that she was a medical social worker for University Hospitals, and her husband works for Cleveland Clinic as a chaplain. Tr. 60-61. Juror No. 22 stated that he and his wife were resident physicians for Cleveland Clinic at the main campus. Tr. 67. He also stated that he was concerned about implicit bias because he and his wife are physicians and he discharges patients to the Rehabilitation Hospital. Tr. 79-81.

{¶13} The trial court did not strike juror No. 7 for cause because "she is not familiar with the rehabilitation center, and she did believe that she could follow the instructions of the Court." Tr. 170. The trial court excused juror No. 17 for cause. The trial court did not strike juror No. 22 for cause. The trial court stated

that "the doctor is very smart, and I think that he's made it clear that through his intelligence, he's not only cognitive of his bias but also his limitations and strengths. . . ." Tr. 172. Susan used a preemptory challenge to strike juror No. 7. *Id*. Juror No. 22 was eventually excused by the trial court because the panel and all alternates had been chosen. Tr. 178. Voir dire concluded, and opening statements and witness testimonies were presented the next day.

## B. Experts' Testimonies

{¶14} Two expert witnesses testified at trial, Dr. Eric Gluck ("Dr. Gluck") and Dr. Steve Williams ("Dr. Williams"). At trial, Dr. Gluck testified as an expert witness on behalf of Susan and Andrew. Dr. Gluck, a critical care doctor from Chicago, Illinois, runs the fellowships in pulmonary and critical care medicine and has practiced critical care medicine since 1986. Dr. Gluck is board certified in internal medicine, pulmonary diseases, and critical care medicine.

{¶15} Dr. Williams testified as an expert witness on behalf of Dr. Ghaffari. Dr. Williams, a physical medicine and rehabilitation specialist from Philadelphia, Pennsylvania, practices on patients who have experienced neurological injuries such as Guillain-Barré, multiple sclerosis, spinal cord injury, brain injury, and stroke. Dr. Williams also see patients that are rehabilitating from back, knee, hip, and neck pains.

## III. Dr. Gluck's Testimony

{¶16} Dr. Gluck testified that he practices on patients who have insulin dependent diabetes who have left ventricular hypertrophy, identical to Andrew's condition. Dr. Gluck also testified that he has experience with prescribing morphine to patients in intensive care units, specifically to "tens of thousands of patients." Tr. 413. Dr. Gluck, who has practiced medicine for 50 years, testified that although he is not a physical medicine and rehabilitation physician, he is qualified to give his expertise on the administration of morphine. Specifically, he stated, "Well, I think this case is mostly about morphine, and although I don't typically work in a PM & R situation, I do distribute morphine to many, many patients." Tr. 414. He continued, "I know the algorithms that are necessary to give it safely. I know how to monitor the patient who has gotten it so that the patient has no adverse events. So this is an overlap where two doctors with different specialities basically are doing the same thing." *Id.*

{¶17} Dr. Gluck testified that Andrew experienced confusion and disorientation that is more in line with delirium instead of pain. Dr. Gluck noted that "prior to the administration of morphine, there were no vital signs taken immediately before." Tr. 423. "The morphine was given by push when it should have been infused more slowly by drip. The dose of morphine was significantly higher than it would be under normal circumstances." *Id.* "This was a patient who had not had opioids for a consistent period of time, so we call them opioid naive, and so we don't exactly know how they're going to respond, we always go very

slowly, and we monitor them very carefully." Tr. 424. "Morphine was probably not the best drug for this patient, given his renal failure." *Id.*

**{¶18}** Dr. Gluck was asked if it was appropriate that Andrew received morphine without continuous monitoring. He responded, "No." You need to have — if not continuous monitoring, monitoring every few minutes for the first dose of medication." Tr. 425.

**{¶19}** As to Dr. Ghaffari's breach of standard of care, Dr. Gluck testified that Dr. Ghaffari breached the standard of care in several ways. First, he breached by administering morphine to Andrew without knowledge of his blood pressure. Tr. 446. Second, he breached by failing to provide a note to the medical staff regarding Andrew's change in status. Tr. 455. Third, he breached by administering morphine to Andrew with Andrew's renal failure and not being able to excrete the drug. Tr. 456. Fourth, he breached by being unaware of Andrew's health status and blood-pressure issues the day before his death. Tr. 458. Fifth, he breached by not returning to the facility once he was made aware of Andrew's change in status. Tr. 513. Sixth, he breached by not monitoring the morphine in a morphine-naive patient. *Id.* Dr. Gluck testified that the administration of the morphine was the direct cause of Andrew's death.

**{¶20}** Under cross-examination, Dr. Gluck answered in the affirmative when asked if the only action of Dr. Ghaffari that was a direct and proximate cause of Andrew's death was the administration of morphine. Tr. 536. Dr. Gluck testified

that it would not have mattered if Dr. Ghaffari came back to the facility after the administration of morphine because "the dye [sic] had already been cast; it wouldn't have made a difference." Tr. 537. Dr. Gluck also answered in the affirmative that no other violation of standard of care caused the death of Andrew other than the administration of morphine. Tr. 538.

## IV. Dr. Williams's Testimony

{¶21} Dr. Williams testified that it was his understanding that morphine was prescribed to Andrew because Andrew was complaining of pain, caused by neuropathy due to his condition. He also testified that 4 milligrams of morphine met the standard of care because it was administered for Andrew's pain and how it was given to Andrew would not determine Andrew's outcome. However, under cross-examination, Dr. Williams testified that if Dr. Ghaffari gave morphine for something other than pain, he breached the standard of care.

{¶22} Also, during cross-examination, Dr. Williams testified that he heard Nurse Sultzer gives thousands and thousands of doses of morphine to patients. Tr. 1070. The trial testimony is as follows:

| Attorney: | Doctor, you said that you knew there's been testimony of thousands and thousands of doses of morphine being given by Nurse Sultzer, right? |
| --- | --- |
| Williams: | Yes. |
| Attorney: | That wasn't in her deposition, was it? |
| Williams: | I heard that from Mr. — someone yesterday. |

| Attorney: | One of the lawyers — |
|---|---|
| Williams: | Yes. |
| Attorney: | — for Dr. Ghaffari — |
| Williams: | Yes. |
| Attorney: | — told what you the testimony has been in this courtroom? |

Tr. 1078.

{¶23} After admitting that Dr. Ghaffari's attorneys recounted trial testimony to Dr. Williams, Susan's attorney stated:

> The reason I ask you, Doctor, is because Dr. Ghaffari's lawyers filed a motion that no one witness should know the testimony of another witness before taking the stand, and we agree with them, and we represented to the Court that we would not violate that order, and that we would make sure that our witness were separate — witnesses were separated and we wouldn't share any testimony until the witness took the stand. Are you aware of that?

Tr. 1079.

{¶24} Dr. Williams replied that he was unaware of the court order. Later, under redirect, Dr. Williams stated that he and Dr. Ghaffari's attorneys did not discuss the specifics of Nurse Sultzer's trial testimony. Tr. 1093.

{¶25} As to Dr. Ghaffari's breach of the standard of care, he testified that although Dr. Ghaffari's administration of morphine to Andrew was inconsistent with his recommendations, Dr. Ghaffari did not breach the standard of care because "none of us know what he [Dr. Ghaffari] was thinking, but we take

something called the Hippocratic Oath, which is an oath that we swear to, as physicians, that we will do no harm. We never intentionally do things to patients that we anticipate will cause harm. We're given that oath at the end of commencement, and we live by it. It is an honorable profession. . . . Dr. Ghaffari is a physician. I assume he is an honorable physician who does not set out daily to cause harm to his patients." Tr. 1058.

{¶26} At the conclusion of Dr. Williams's testimony, Susan's trial counsel moved the court to strike Dr. Williams's testimony in its entirety. Counsel also suggested in the alternative that the court could give an instruction as part of the jury charge that there was breach of Dr. Ghaffari's motion to separate witnesses. Susan's trial counsel stated, "Their motion asked for a sequestration of all people. The answer wasn't did they do it the same; the answer was specific. Thousands and thousands of doses." Tr. 1106. "So we ask that Dr. Williams's testimony in its entirety be stricken from the record first. If not, we believe it's absolutely mandatory that there be an instruction given to the jury on the violation." *Id*.

{¶27} The trial court responded, stating: "So there is a pending motion, and I think as a rule of thumb with any court, you always try to go for the least restrictive option when doing anything. I believe at this time I'm not going to strike his entire testimony." Tr. 1111. The trial court decided to give a curative instruction to the jury, stating: "This Court granted the defense's motion for separation of witnesses. Based on testimony provided at trial, it appears that this order was

violated by the defense when they discussed trial testimony with the expert witness, Dr. Williams. This was a violation of the Court's order." Tr. 1324. "You are instructed to disregard any testimony you find that influenced Dr. Williams' trial testimony had he not been provided with such information." *Id*.

## A. Directed Verdict and Standard of Care

**{¶28}** At the end of the appellant's case, Dr. Ghaffari moved for a directed verdict on any claim of negligence other than the administration of the morphine. Tr. 724. Dr. Ghaffari moved "for a directed verdict on any of those other claims of standard of care violations that did not have the required causal link under *Bruni*. at this time." *Id*. "The only instruction the jury should now be given, is did Dr. Ghaffari fall beneath the standard of care on the 21st in ordering 4-milligrams of morphine. And the second interrogatory; did it proximately cause the death." Tr. 733.

**{¶29}** However, the appellant argued that "the fact that he [Dr. Ghaffari] deviated from the standard of care and didn't write a note, it's relevant that he deviated from the standard of care, because it shows you he was in a hurry. That's going to be our argument." Tr. 734-735. "We believe the administration of the morphine was unreasonable. We believe he didn't write a note because he was in a hurry. He had priorities other than the patient that day." Tr. 735. "We believe he didn't go back, not because the standard of care didn't demand that he go back; he didn't go back because he had other reasons. So we believe those deviations

from the standard of care guided our evidence of his decision to not go back." *Id*. "Everything he did was for speed to leave, and the fact that those are deviations from the standard of care support he was acting unreasonably, even by his own experts." *Id*. "He deviated from the standard of care to not go back because his daughter was having issues. So those deviations come in because they go to explain his unusual course of conduct. That's not only unusual; his own expert said I can't imagine a reason why any provider wouldn't go back." *Id*.

{¶30} After hearing from both parties, the trial court granted the directed verdict, stating, "You are permitted to argue, just not using the standard of care." Tr. 743.

### B. Verdict

{¶31} At the conclusion of the trial, the jury found in favor of Dr. Ghaffari. The trial court read the interrogatories presented to the jury.

> With regard to interrogatory No. 1; do you find by a preponderance of the evidence that the administration of 4-milligrams of morphine on August 21, 2020, was a violation of the standard of care by Saman Ghaffari, D.O.? A "No" was circled. There were six signatures. With regard to the general verdict forms, there is a verdict form in favor of defendant and against plaintiff.

Tr. 1353-1354.

### C. Appeal

{¶32} Susan filed this appeal assigning four errors for our review:

1. The trial court abused its discretion in failing to exclude defendant's standard of care expert after defense counsel explicitly violated defendant's own witness separation order;

2. The trial court erred in granting defendant's motion for a partial directed verdict;

3. The trial court erred in preventing plaintiff from discussing relevant breaches of the standard of care which were already admitted into evidence; and

4. The trial court abused its discretion in denying plaintiff's challenge to prospective Juror No. 7 for cause.

## V. Violation of Court Order

### A. Standard of Review

{¶33} "'Exclusion of witnesses is . . . a decision within the sound discretion of the trial court.'" *State v. Kelley*, 2023-Ohio-3972, ¶ 31 (8th Dist.), quoting *State v. Smith*, 49 Ohio St.3d 137, 142 (1990).

{¶34} In our instant case, the trial court did not exclude the witness's testimony.

> However, where the court seeks to exclude a witness for violating a separation order, there must be a showing that the party calling the witness consented to, connived in, procured or had knowledge of the witness' disobedience. Secondly, the testimony sought to be introduced must be important to the defense such that exclusion of the evidence constitutes prejudicial error.

*Id. See also e.g., State v. Cottrell*, 2003-Ohio-5806, ¶ 39 (8th Dist.); *State v. Kingsley*, 2010-Ohio-1187, ¶ 24 (5th Dist.).

**{¶35}** "Furthermore, the court has held that the preferred sanction for a separation order violation 'is simply to allow the transgression to reflect upon the witness's credibility.'" *Id.*, quoting *State v. DeWitt*, 2010-Ohio-4777, ¶ 62 (7th Dist.). However, "the Supreme Court of Ohio has cautioned that a reviewing court should be slow to interfere and should not reverse a trial court's ruling admitting or excluding evidence unless the trial court has abused its discretion and the defendant has been materially prejudiced." *Id.* at ¶ 36, citing *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984). "In the context of excluding a witness for a violation of a separation order, we must find whether the witness's exclusion prejudiced the defendant." *Id.*, citing *Smith* at 142.

## B. Law and Analysis

**{¶36}** In Susan's first assignment of error, she argues that the trial court abused its discretion in failing to exclude Dr. Williams's testimony after defense counsel explicitly violated the trial court's witness separation order. Dr. Ghaffari filed a series of motions including a motion for separation of witnesses, requesting that all witnesses be separated in accordance with Evid.R. 615(A), including the family of the decedent who would be providing testimony at trial. Dr. Ghaffari further requested an order from the trial court prohibiting any and all witnesses from disclosing the content of their trial testimony. The trial court granted Dr. Ghaffari's motion.

{¶37} However, during Dr. Williams's testimony, Dr. Ghaffari's expert witness, he testified that Dr. Ghaffari's attorneys relayed Nurse Sultzer's trial testimony to him regarding her administration of morphine. The trial court did not exclude Dr. Williams's testimony from the record, but did provide a curative instruction to the jury. "This Court granted the defense's motion for separation of witnesses. Based on testimony provided at trial, it appears that this order was violated by the defense when they discussed trial testimony with the expert witness, Dr. Williams. This was a violation of the Court's order." Tr. 1324. "You are instructed to disregard any testimony you find that influenced Dr. Williams' trial testimony had he not been provided with such information." *Id.*

{¶38} As previously stated, "[t]he Supreme Court of Ohio has cautioned that a reviewing court should be slow to interfere and should not reverse a trial court's ruling admitting or excluding evidence unless the trial court has abused its discretion and the defendant has been materially prejudiced." *Kelley* at ¶ 36, citing *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984). "In the context of excluding a witness for a violation of a separation order, we must find whether the witness's exclusion prejudiced the defendant." *Id.*, citing *Smith* at 142. "Furthermore, the court has held that the preferred sanction for a separation order violation 'is simply to allow the transgression to reflect upon the witness's credibility.'" *Id.* at ¶ 31, quoting *State v. DeWitt*, 2010-Ohio-4777, ¶ 62 (7th Dist.).

{¶39} Susan has not demonstrated that Dr. Williams's testimony materially prejudiced her, or that the trial court abused its discretion by not excluding his testimony. Susan has not shown that Dr. Williams's testimony that he heard that Nurse Sultzer testified that she administered morphine to thousands of patients demonstrated prejudice. The interrogatory given to the jury was whether Dr. Ghaffari's actions were below the standard of care. The trial court had the option of excluding Dr. Williams's testimony in its entirety or provide curative instructions. The trial court chose to provide a curative instruction to the jury and to weigh his credibility, which is the preferred sanction for violating the order.

{¶40} Therefore, Susan's first assignment of error is overruled.

## VI. Partial Directed Verdict

### A. Standard of Review

{¶41} We review the trial court's decision to grant a directed verdict de novo, with no deference to the trial court's decision. *Day v. Rochling-Glastic Composites, L.P.*, 2020-Ohio-1027, ¶ 13 (8th Dist.).

### B. Law and Analysis

{¶42} In Susan's second assignment of error, she argues that the trial court erred in granting Dr. Ghaffari's motion for a partial directed verdict. "A motion for a directed verdict should be granted when, after construing the evidence most strongly in favor of the party against whom the motion is directed, 'reasonable minds could come to but one conclusion upon the evidence submitted, and that

conclusion is adverse to such party.'" *Rieger v. Giant Eagle, Inc.*, 2019-Ohio-3745, ¶ 9, quoting *White v. Leimbach*, 2011-Ohio-6238, ¶ 22, quoting *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 2002-Ohio-2842, ¶ 4.

{¶43} "Before granting a motion for a directed verdict in accordance with Civ.R. 50(A)(4), the reasonable-minds test requires the court to determine whether there is any evidence of substantive probative value that favors the nonmoving party." *Id.* "Thus, although a motion for a directed verdict does not present a question of fact, when deciding a motion for a directed verdict the court must 'review and consider the evidence.'" *Id.*, quoting *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 68 (1982).

{¶44} The trial court granted the partial directed verdict after deciding that the plaintiff did not establish that a violation of the standard of care proximately caused Andrew's death. "'To prevail on a claim of medical malpractice, a plaintiff must establish through expert testimony the acceptable medical standard of care, the defendant's breach of that standard, and that the breach proximately caused the plaintiff's injuries.'" *Kittis v. Cleveland Clinic Found.*, 2024-Ohio-659, ¶ 16 (8th Dist.), quoting *Schura v. Marymount Hosp.*, 2010-Ohio-5246, ¶ 27 (8th Dist.), citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127 (1976).

{¶45} In *Bruni*, the Supreme Court stated that a plaintiff's burden is as follows:

Under Ohio law, as it has developed, in order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or commission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things. *Ault v. Hall,* 119 Ohio St. 422 (1928) (Citations omitted.)[.]

*Kittis* at ¶ 17, quoting *Bruni* at 131.

**{¶46}** "Expert testimony is generally required to establish both negligence and that the negligence was the proximate cause of the alleged injury." *Id.*, citing *Bruni* at 130. This court has found that "the admissibility of expert testimony on the issue of proximate cause is contingent on the expression of an opinion with respect to the causative event in terms of probability." *Lucsik v. Kosdrosky*, 2017-Ohio-96, ¶ 15 (8th Dist.), citing *Stinson v. England*, 69 Ohio St.3d 451, 455 (1994). "'[A]n event is probable if there is a greater than fifty percent likelihood that it produced the occurrence at issue.'" *Id.*, quoting *id*. "However, there is no requirement that an expert utter any magic words in terms of a reasonable degree of medical certainty or probability." *Id.*, citing *Blair v. McDonagh*, 2008-Ohio-3698, ¶ 27 (1st Dist.); *Coe v. Young*, 145 Ohio App.3d 499, 504 (11th Dist. 2001); *Frye v. Weber & Sons Serv. Repair*, 125 Ohio App.3d 507, 514 (8th Dist. 1998). "Rather, the expert's testimony, when considered in its entirety, must be

equivalent to an expression of probability." *Id.*, citing *Jeffrey v. Marietta Mem. Hosp.*, 2013-Ohio-1055, ¶ 48 (10th Dist.); *Frye* at 514.

**{¶47}** Susan was required to "'prove causation through medical expert testimony in terms of probability to establish that the injury was, more likely than not, caused by the defendant's negligence.'" *Kittis* at ¶ 18, quoting *Roberts v. Ohio Permanente Med. Group*, 76 Ohio St.3d 483, 485 (1996), citing *Shumaker v. Oliver B. Cannon & Sons, Inc.*, 28 Ohio St.3d 367 (1986).

**{¶48}** In Dr. Gluck's direct testimony, he stated that Dr. Ghaffari breached the standard of care by administering morphine to Andrew without knowledge of his blood pressure; failing to provide a note to the medical staff regarding Andrew's change in status; administering morphine to Andrew with Andrew's renal failure and not being able to excrete the drug; being unaware of Andrew's health status and blood-pressure issues the day before his death; not returning to the facility once he was made aware of Andrew's change in status; and not monitoring the morphine in a morphine-naive patient.

**{¶49}** Under cross-examination, Dr. Gluck testified that Dr. Ghaffari's decision to give Andrew morphine was the direct cause of his death and that even if Dr. Ghaffari returned to the facility, Andrew would have still died because he had already been given the morphine. Because of these statements, Dr. Ghaffari argued that not returning to the facility was not a proximate cause of Andrew's death and thus, it should not be argued that he breached the standard of care for failing to

return. Susan argued, in contrast, that explaining why Dr. Ghaffari did not return, because of his ongoing family issues, explained why he was in a hurry and breached the standard of care by giving Andrew morphine even though he was a morphine-naive patient.

{¶50} Dr. Ghaffari's argument is not well taken. Although the administration of the morphine was opined as the direct cause of Andrew's death, Dr. Ghaffari's failure to take Andrew's blood pressure, failure to provide a note to the medical staff regarding Andrew's change in status, being unaware of Andrew's health status and blood pressure, and not providing other potential medications for Andrew's condition that would not have cause his death are particular things that a physician or surgeon of ordinary skill, care, and diligence would not have done under like or similar conditions or circumstances, and Andrew's death was the result of the failure of doing or not doing such things. While it can be agreed that Dr. Ghaffari's not returning to the hospital was not a proximate cause of Andrew's death, the other breaches were.

{¶51} Dr. Gluck testified that the standard of care is that a patient's blood pressure is taken before the administration of morphine, morphine should not be given to a patient in renal failure, and Andrew's symptoms were not indicative of pain, but of delirium. However, Dr. Williams testified that Dr. Ghaffari did not breach the standard of care because he assumes that "he [Dr. Ghaffari] is an honorable physician who does not set out daily to cause harm to his patients."

Tr. 1058. Dr. Williams's testimony does not adequately explain whether Dr. Ghaffari's actions were not a breach of the standard of care, but rather an opinion about the intentionality of Dr. Ghaffari. The argument that Dr. Ghaffari intentionally harmed Andrew was not presented. However, the question is whether Dr. Ghaffari's actions in treating Andrew breached the standard of care.

{¶52} Given Dr. Gluck's testimony and the evidence presented at trial, we have determined that Susan proved causation through medical expert testimony in terms of probability to establish that Andrew's death, more likely than not, was caused by Dr. Ghaffari's negligence and breach of standard of care. The trial court erred by granting Dr. Ghaffari's motion for a partial directed verdict.

{¶53} Therefore, Susan's second assignment of error is sustained.

## VII. Standard of Care

### A. Standard of Review

{¶54} "The determination of the admissibility of expert testimony is within the discretion of the trial court. Evid.R. 104(A)." *Walker v. Ford Motor Co.*, 2014-Ohio-4208, ¶ 23 (8th Dist.). "A trial court's decision to admit or exclude expert testimony will not be reversed absent an abuse of discretion." *Id.*, citing *Valentine v. Conrad*, 2006-Ohio-3561, ¶ 9; *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 616 (1998).

{¶55} An abuse of discretion occurs when a court exercises its judgment "in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

### B. Law and Analysis

{¶56} In Susan's third assignment of error, she argues that the trial court erred in preventing her from discussing relevant breaches of the standard of care that were already admitted into evidence. When the trial court issued its decision granting Dr. Ghaffari's motion for a partial directed verdict, it stated, "At this time, the Court is going to grant the directed verdict. You are permitted to argue, just not using the standard of care." Tr. 743. Also, the trial court granted Dr. Ghaffari's request that the jury only consider the giving of 4-milligrams of morphine as a violation of the standard of care and not any of Dr. Ghaffari's other acts.

{¶57} Susan argues that the admissibility of a breach of the standard of care is not contingent upon a related proximate cause opinion. "'The crux of a medical-malpractice claim is whether the defendant-doctor's treatment fell below the appropriate standard of care.'" *Adams v. Durrani*, 2022-Ohio-60, ¶ 21 (1st Dist.), quoting *Setters v. Durrani*, 2020-Ohio-6859, ¶ 48 (1st Dist.).

{¶58} "'In order to establish medical malpractice, a plaintiff must show: (1) the standard of care recognized by the medical community, (2) the failure of the defendant to meet the requisite standard of care, and (3) a direct causal connection between the medically negligent act and the injury sustained.'" *Santamaria v.*

*Cleveland Clinic Found.*, 2023-Ohio-3362, ¶ 17 (8th Dist.), quoting *Stanley v. The Ohio State Univ. Med. Ctr.*, 2013-Ohio-5140, ¶ 19 (10th Dist.), citing *Bruni*, 46 Ohio St.2d 127 at 130. "'Ordinarily, the appropriate standard of care must be demonstrated by expert testimony. That expert testimony must explain what a physician of ordinary skill, care, and diligence in the same medical specialty would do in similar circumstances.'" *Id.*, quoting *Gabriel v. Ohio State Univ. Med. Ctr.*, 2015-Ohio-2661, ¶ 13 (10th Dist.). "As long as there is expert testimony minimally establishing opinions as to the breach or non-breach of the standard of care in a medical claim action, the parties are entitled to the jury's resolution of the claims." *Id. See Yung v. UC Health, LLC*, 2023-Ohio-789, ¶ 20 (1st Dist.).

{¶59} In medical-malpractice cases, "'a witness need not practice in the exact same specialty as that of the defendant-physician; rather, it is the scope of the witness's knowledge and not the artificial classification by title that should govern the threshold question of his qualifications.'" *Adams v. Durrani*, 2022-Ohio-60, ¶ 50 (1st Dist.), quoting *Guiliani v. Shehata*, 2014-Ohio-4240, ¶ 43 (1st Dist.), citing *Alexander v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d 155, 160 (1978). "'[A]n expert need only aid the trier of fact in the search for the truth and need not be the best witness on the subject.'" *Id.*, quoting *Guiliani* at ¶ 43.

{¶60} In *Ishler v. Miller*, 56 Ohio St.2d 447, 453 (1978), the Ohio Supreme Court held that the trial court did not err in permitting a physician specializing in the fields of neurology and psychiatry to testify that the defendant-doctor, an

orthopedic surgeon, performed unnecessary surgery. The expert witness worked in close conjunction with orthopedic surgeons as an attending neurologist at a primarily orthopedic hospital, frequently served as a consultant to orthopedic surgeons attempting to diagnose lower back problems, employed the same diagnostic tools as used by orthopedic surgeons in his work, and demonstrated a knowledge of the standards or procedures generally used by members of the defendant's profession in arriving at a decision to perform back surgery. *Id.*

{¶61} Dr. Gluck testified that he has previous experience treating patients with insulin dependent diabetes who have left ventricular hypertrophy, identical to Andrew's condition. Dr. Gluck also testified that he has experience with prescribing morphine to patients in intensive care units, specifically to "tens of thousands of patients." Tr. 413. Dr. Gluck, who has practiced medicine for 50 years, testified that although he is not a physical medicine and rehabilitation physician, he is qualified to give his expertise on the administration of morphine. Specifically, he stated, "Well, I think this case is mostly about morphine, and although I don't typically work in a PM & R situation, I do distribute morphine to many, many patients." Tr. 414. He continued, "I know the algorithms that are necessary to give it safely. I know how to monitor the patient who has gotten it so that the patient has no adverse events. So this is an overlap where two doctors with different specialties basically are doing the same thing." *Id.*

{¶62} Dr. Gluck testified to the appropriate standard of care and established an opinion that Dr. Ghaffari breached the standard of care. Dr. Gluck testified that Dr. Ghaffari breached the standard of care by administering morphine to Andrew without knowledge of his blood pressure; failing to provide a note to the medical staff regarding Andrew's change in status; administering morphine to Andrew with Andrew's renal failure and not being able to excrete the drug; being unaware of Andrew's health status and blood-pressure issues the day before his death; not returning to the facility once he was made aware of Andrew's change in status; and not monitoring the morphine in a morphine-naive patient. Thus, Susan is entitled to the jury's resolution of the claims.

{¶63} Therefore, Susan's third assignment of error is sustained.

## VIII. Prospective Juror Challenge

### A. Standard of Review

{¶64} "We review the trial court's decision on whether to remove a juror for cause for an abuse of discretion." *State v. Lloyd*, 2021-Ohio-1808, ¶ 18 (8th Dist.), citing *State v. Smith*, 80 Ohio St.3d 89, 105 (1997). "'A court abuses its discretion when a legal rule entrusts a decision to a judge's discretion, and the judge's exercise of that discretion is outside of the legally permissible range of choices.'" *Id.*, quoting Lloyd at ¶ 18, citing *U.S. v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 372 (1961) (Frankfurter, J., dissenting). "Abuse-of-discretion review is deferential

and does not permit an appellate court to simply substitute its judgment for that of the trial court." *Id.*, citing *State v. Darmond*, 2013-Ohio-966, ¶ 34.

### B. Law and Analysis

**{¶65}** In Susan's fourth assignment of error, she argues that the trial court abused its discretion in denying her challenge to juror No. 7 for cause. As a result, Susan had to use one of her peremptory challenges to remove the prospective juror. During voir dire, juror No. 7 stated that she was a registered nurse at the Cleveland Clinic Hospital. She also stated that her husband works for the Cleveland Clinic Hospital at the main campus. Andrew was a patient at the Cleveland Clinic Rehabilitation Hospital in Avon Lake. Susan wanted juror No. 7 removed because when asked if she would be able to listen to the expert's testimony, rather than substituting her own judgments, juror No. 7 stated that she would "take the evidence from the medical records and figure it out." Tr. 167.

**{¶66}** "Challenges for cause permit the parties to reject jurors on narrowly specified bases that must be demonstrated in the record and found by the trial court." *Lloyd* at ¶ 16. A prospective juror may be challenged for cause if he or she demonstrates bias toward either party in the case. "Moreover, pursuant to R.C. 2313.17(B)(9), a potential juror may be challenged for cause if the person 'discloses by the person's answers that the person cannot be a fair and impartial juror or will not follow the law as given to the person by the court.'" *Id.*

**{¶67}** "The trial court has broad discretion in determining a juror's ability to be impartial." *Id.* at ¶ 17, citing *State v. Nields*, 93 Ohio St.3d 6, 20 (2001). "Resolution of the impartiality issue rests in large part on the trial court's assessment of the juror's credibility and demeanor, and the context in which the issue arises." *Id.*, citing *Skilling v. U.S.*, 561 U.S. 358, 386 (2010); *State v. Williams*, 79 Ohio St.3d 1, 8 (1997). "Therefore, a reviewing court will defer to the trial judge who sees and hears the juror." *Id. See, e.g., Chang v. Cleveland Clinic Found.*, 2003-Ohio-6167, ¶ 6 (8th Dist.).

**{¶68}** Juror No. 7 was asked if she could make a reasoned judgment in this case, and she stated that she could. Tr. 166. After a review of the record, Susan has not demonstrated that the trial court abused its discretion by denying her challenge to juror No. 7 for cause. Juror No. 7 did demonstrate any bias to either Dr. Ghaffari or Susan. She also did not disclose that she could not be a fair or impartial juror or follow the law given by the trial court.

**{¶69}** Therefore, Susan's fourth assignment of error is overruled.

**{¶70}** Judgment affirmed in part, reversed in part, and remanded to the trial court for a new trial.

It is ordered that appellee and appellant share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

EILEEN A. GALLAGHER, A.J., CONCURS;
LISA B. FORBES, J., CONCURS IN PART AND DISSENTS IN PART
(WITH SEPARATE OPINION)

LISA B. FORBES, J., CONCURRING IN PART AND DISSENTING IN PART:

**{¶ 71}** I agree with the majority's resolution of assignments of error Nos. 1 and 4. However, I would overrule assignments of error Nos. 2 and 3 and affirm the trial court's rulings. Susan's expert testified that only the administration of morphine caused Andrew's death. Thus, the partial directed verdict in Dr. Ghaffari's favor was proper regarding all other alleged standard-of-care violations. Furthermore, the trial court acted within its discretion in limiting the use of the term "standard of care violation" to the administration of morphine. That phrase is a term of art and a necessary element of a malpractice claim. Permitting its use in reference to conduct unsupported by expert testimony on causation would have risked misleading the jury into assuming such conduct caused Andrew's death when it did not.

## I. Assignment of Error 2: The Partial Directed Verdict

**{¶ 72}** As the majority correctly notes, to prevail on a medical-malpractice claim, a plaintiff must establish three essential elements: (1) the applicable standard

of care, (2) a breach of that standard (i.e., negligence), and (3) proximate causation linking the breach to the injury. *Bruni*, 46 Ohio St.2d at 131; *see also Kittis,* 2024-Ohio-659, at ¶ 17 (8th Dist.). All three elements must be satisfied for a malpractice claim to succeed. Moreover, plaintiffs must present medical expert testimony establishing causation in terms of probability — that is, the expert must show the injury was more likely than not caused by the defendant's negligence. *Kittis* at ¶ 18.

{¶ 73} Although I agree with the majority's articulation of the law, the flaw in its reasoning lies in its disregard for the actual testimony presented at trial. The plaintiff's sole medical expert, Dr. Gluck, clearly and unequivocally testified that the only standard-of-care violation that proximately caused Andrew's death was the administration of morphine. Specifically, Dr. Gluck testified as follows:

> Q: In this case, you have been asked to opine on both [standard of care and causation], fair?
>
> A: Yes.
>
> . . .
>
> Q: Whether [Dr. Ghaffari] considered the contraindications, at the end of the day, it was the decision to administer the morphine that, at least in your opinion, was the proximate cause of death, fair?
>
> A: Correct.
>
> Q: No other violation of the standard of care caused the death, according to Dr. Gluck, fair?
>
> A: Correct.

{¶ 74} Since Dr. Gluck explicitly stated that none of the other alleged breaches of the standard of care proximately caused Andrew's death, the trial court properly granted a directed verdict in favor of Dr. Ghaffari on the remaining standard-of-care violations that may have otherwise served as a basis for malpractice. Without expert testimony establishing proximate causation as to those other alleged standard-of-care violations, those claims necessarily fail. *See Geletka v. MetroHealth,* 2023-Ohio-934, ¶ 35 (8th Dist.) (holding that the trial court correctly granted directed verdict in favor of the defense where plaintiff's expert's testimony failed to establish that insertion of mesh by the defendant was causally related to plaintiff's complaints of pain); *see also White,* 2011-Ohio-6238, at ¶ 38-39, 42-45 (upholding a directed verdict where the plaintiff failed to present expert testimony that an undisclosed risk materialized and proximately caused injury); *Robertson v. Mt. Carmel E. Hosp.,* 2011-Ohio-2043, ¶ 44, 55 (10th Dist.) (determining that where plaintiff was unable to establish a causal link through expert testimony, that expert's testimony on the subject was irrelevant and properly prohibited, and the trial court properly granted a directed verdict).

{¶ 75} Rather than relying on Dr. Gluck's actual testimony, the majority imputes statements to him that he never made. In doing so, the majority finds that "Andrew's death was the result of the failure of doing or not doing such things" as failing to take Andrew's blood pressure, failing to notify medical staff of his change in status, being unaware of Andrew's health conditions, and failing to provide

alternative treatments that would not have caused his death. Notably, these findings directly contradict Dr. Gluck's unequivocal testimony at trial that the only proximate cause of death was morphine administration.

{¶ 76} Considering Dr. Gluck's testimony that Dr. Ghaffari's administration of morphine was the proximate cause of Andrew's death and that no other violation of a standard of care proximately caused Andrew's death, I would find that reasonable minds could come to but one conclusion: Susan failed to establish causation as to any alleged breaches of the standard of care other than the administration of morphine. I would affirm the trial court's decision to grant the partial directed verdict and overrule the second assignment of error.

## II. Assignment of Error No. 3: The Limitation of the Phrase "Standard of Care Violation"

{¶ 77} After granting a partial directed verdict, the trial court ruled that Susan could continue presenting evidence of Dr. Ghaffari's other conduct that Dr. Gluck identified as breaching the standard of care. She was also permitted to ask expert witnesses whether those actions were "unreasonable." However, the court prohibited the use of the phrase "standard of care" in reference to any conduct other than the administration of morphine. As the court explained, "You are permitted to argue, just not using the phrase 'standard of care.' Obviously, those facts can still be brought up."

{¶ 78} In her third assignment of error, Susan argues that the trial court abused its discretion by preventing her from discussing alleged breaches of the

standard of care other than the administration of morphine. Although these other alleged breaches did not directly cause Andrew's death, she claims they provided essential context for why the 4 mg dose of morphine was unreasonable and itself a breach of the standard of care. I respectfully disagree with the majority's acceptance of this argument and of its decision to order a new trial because of it.

{¶ 79} To place this issue in context, the trial court did not exclude any evidence at trial but instead limited how it could be characterized. Susan was not barred from referencing Dr. Ghaffari's conduct that allegedly fell below the standard of care; this evidence was presented to the jury and discussed throughout the trial. The court simply restricted the use of the specific legal term "standard of care" in reference to conduct that, according to Dr. Gluck, did not cause Andrew's death. This narrow limitation aimed to avoid jury confusion.

{¶ 80} Evid.R. 403(A) states: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." "Trial courts are afforded broad discretion in balancing the probative value of evidence against the danger of unfair prejudice to the defendant under Evid.R. 403(A)." *State v. Sepeda*, 2020-Ohio-4167, ¶ 26 (6th Dist.) An abuse of discretion "'implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶ 81} Establishing a standard of care and proving a breach (i.e. a violation of the standard of care) are two of the three essential elements of a medical-malpractice claim. *See Bruni*, 46 Ohio St.2d, at 131. The phrase "standard of care" or "standard of care violation" thus carries significant legal weight in the medical malpractice context and could mislead jurors into thinking that any breach automatically supports liability, even without the causation element having been met. The trial court appropriately exercised its discretion under Evid.R. 403(A) to limit the use of this term and prevent such confusion, especially in light of the fact that it had just entered a directed verdict in Dr. Ghaffari's favor as to all conduct alleged to be a breach of the standard of care except for the administration of morphine.

{¶ 82} For these reasons, I would conclude that the trial court did not abuse its discretion by restricting use of the phrase "standard of care" solely to the administration of morphine. The court still permitted discussion and argument regarding Dr. Ghaffari's other actions. Given Dr. Gluck's unambiguous testimony that only the morphine administration constituted a causal breach, Susan has not shown the court's ruling to be unreasonable, arbitrary, or unconscionable. I would, therefore, overrule the third assignment of error.